[No. G045878. Fourth Dist., Div. Three. Oct. 5, 2012.]

CITIZENS ASSOCIATION OF SUNSET BEACH, Plaintiff and Appellant, v.
ORANGE COUNTY LOCAL AGENCY FORMATION COMMISSION et al., Defendants and Respondents.

## COUNSEL

Howard Jarvis Taxpayers Foundation, Trevor A. Grimm, Jonathan M. Coupal and Timothy A. Bittle for Plaintiff and Appellant.

Best Best & Krieger, Scott C. Smith and Daniel S. Roberts for Defendant and Respondent Orange County Local Agency Formation Commission.

Colantuono & Levin, Michael G. Colantuono, Holly O. Whatley and Michael R. Cobden for Defendant and Respondent City of Huntington Beach.

Jarvis, Fay, Doporto & Gibson, Rick W. Jarvis and Benjamin P. Fay for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendant and Respondent City of Huntington Beach.

OPINION

## BEDSWORTH, J.—

## I. INTRODUCTION

Taxpayers living in Huntington Beach have been paying two taxes which taxpayers in next-door Sunset Beach haven't. First, Huntington Beach taxpayers have been paying a utility tax of 5 percent. Second, they have been paying a "retirement property tax" of about $15 per each $100,000 of assessed valuation, on top of Proposition 13's 1 percent limit, for Huntington Beach pension costs incurred prior to the passage of Proposition 13 in 1978.[1]

Until now the taxpayers of Sunset Beach have been spared those taxes. Sunset Beach is a relatively small strip of land, consisting of about 133 acres, which, for over a century, has been an unincorporated part of the County of Orange. Because of this small size, Huntington Beach was able, with the approval of the Orange County Local Agency Formation Commission (OC LAFCO), to annex Sunset Beach without a vote under California's "island annexation" statute. (See Gov. Code, § 56375.3.[2])

Another California statute provides that any territory annexed to a city shall be subject to that city's previously authorized taxes. (§ 57330.) So, with the annexation, Sunset Beach residents have now found themselves subject to the two additional taxes levied on taxpayers in Huntington Beach for which no one in Sunset Beach voted.

A group of Sunset Beach residents calling themselves the Citizen's[3] Association of Sunset Beach (the Citizens Association) brought this litigation just before the annexation, seeking either to prevent the annexation, or at least to require a vote by the electorate in Sunset Beach to approve the application of the two additional taxes that would otherwise accompany the annexation. Their argument is that Proposition 218 (the Right to Vote on Taxes Act), added to the California Constitution as articles XIII C and XIII D,

---

[1] Huntington Beach's retirement tax over and above the Proposition 13 limit only collects for retirement benefits incurred prior to Proposition 13 in 1978, and does not apply to " 'new' retirement benefits" liability, which was incurred after Proposition 13. (*Howard Jarvis Taxpayers Assn. v. County of Orange* (2003) 110 Cal.App.4th 1375, 1385–1387 [2 Cal.Rptr.3d 514].) Huntington Beach cannot fund retirement benefits incurred after Proposition 13 from this "excess levy." (110 Cal.App.4th at p. 1385.)

[2] All undesignated statutory references in this opinion are to the Government Code.

[3] While the transcript of the proceedings below refers to appellant as "Citizen's," the appellate materials, including the briefs, generally delete the apostrophe. We adopt the more recent and explicable usage.

requires that Sunset Beach residents be given the chance to vote on the two "new" taxes.[4] The trial court eventually denied the Citizens Association's petition, allowed the annexation to go through, and the Citizens Association has brought this appeal.

We conclude Proposition 218 was never intended to require votes incident to annexations of territory by local governments. It was intended to prevent politicians from trying to circumvent Proposition 13 by inventing so-called assessment districts which supposedly could impose taxes without any vote of the electorate. Nor does the text of Proposition 218, even liberally construed, require an election on tax differentials in connection with an annexation. Most dispositive are the dual track elections on taxes expressly required by Proposition 218: majority votes for general taxes, supermajority votes for special taxes. If the proponents of Proposition 218 had intended to require votes on annexations whenever there is a difference in the taxes between the annexing territory and the territory to be annexed, they would, at the very least, have made provision for the fact that some of the taxes would require only a majority vote, but other taxes would require a two-thirds vote. None of that is in the text of Proposition 218. We therefore affirm the trial court's denial of the petition brought by the Citizens Association.

## II.  BACKGROUND

### A.  *The Move to Annex Sunset Beach*

Both Sunset Beach and its larger neighbor Huntington Beach got their start in 1904 in response to a railway extension connected with the construction of the Huntington Beach Pier depot. At the time, the land that is now Huntington Harbor (which lies generally behind Sunset Beach to the inland) was marshland. Until Huntington Harbor was developed in the early 1960's, Sunset Beach was almost a literal "island," with train tracks running along the beach, housing tracts built on the inland side of the train tracks, and marshland behind it.

Unlike Huntington Beach, though, Sunset Beach never incorporated as a city, in part due to its relatively small size. Today, Sunset Beach consists of less than 134 acres, tucked into the northwestern corner of Orange County. There are roughly two beach acres for every residential acre. There are about 1,200 permanent residents and most of the community is on the ocean side of Pacific Coast Highway. All parties agree the community retains an identity distinctly separate from Huntington Beach.

---

[4] The full text of Proposition 218 is set out as an appendix to *Keller v. Chowchilla Water Dist.* (2000) 80 Cal.App.4th 1006, 1018–1022 [96 Cal.Rptr.2d 246].

As an unincorporated county area, Sunset Beach has been receiving a number of its local government services from the County of Orange, including police protection from the Orange County Sheriff's Department. Fire protection has been shared by the Orange County Fire Authority and Huntington Beach's fire department. However, since the 1990's the County of Orange has wanted to pull back from "municipal-type services," thus raising the question of whether Sunset Beach might incorporate as a city on its own or be annexed by nearby Huntington Beach or Seal Beach. A feasibility study prepared in May 2010 to explore the possibility of Sunset Beach incorporating on its own projected total revenue would exceed costs by about 10 percent and found incorporation feasible under three scenarios, albeit each of the three scenarios under consideration contemplated "expanded" utility taxes. Nothing came of the self-incorporation option.

But each California county has its own LAFCO, or "local agency formation commission" to oversee annexations and formations of local governments. (See *Community Water Coalition v. Santa Cruz County Local Agency Formation Com.* (2011) 200 Cal.App.4th 1317, 1323–1324 [134 Cal.Rptr.3d 899] [overview of Cortese-Knox-Hertzberg Local Government Reorganization Act of 2000 (§ 56000 et seq.)].)[5] As part of the county's general desire to divest itself of municipal-type services, OC LAFCO had been eyeing the possible annexation of Sunset Beach by an adjacent city since at least 2005. Sometime before April 2010, OC LAFCO initiated the idea of having Huntington Beach annex Sunset Beach.

A representative from OC LAFCO acknowledged the "request was not initiated" by Huntington Beach. It came up at a Huntington Beach City Council meeting in August 2010. The Huntington Beach City Council voted to direct its staff to prepare the necessary paperwork for a formal application to OC LAFCO for annexation. Huntington Beach then applied to annex Sunset Beach. OC LAFCO staff recommended approval on December 8, 2010.

The next day the Citizens Association filed this action.

B.  *The Litigation*

The Citizens Association's petition sought a writ of mandate immediately prohibiting OC LAFCO from taking any further action on Huntington Beach's annexation petition. The Citizens Association also sought an order

---

[5] In Orange County, for example, the LAFCO that eventually approved Huntington Beach's annexation of Sunset Beach consisted of two city councilmembers (from Lake Forest and Fountain Valley), two members of the county board of supervisors, a water district director, a sanitary district director, and a representative of the general public.

directing OC LAFCO to either reject the annexation petition or impose as a condition "a favorable vote" by the residents of Sunset Beach "in an election pursuant to Proposition 218 regarding imposition of all of the City's special taxes, including but not limited to the utility tax and the property tax override." Lastly, the Citizens Association asked for a preliminary injunction. The trial court granted the preliminary injunction on January 19, 2011, reasoning that the Citizens Association had shown a likelihood of success and would be entitled to some kind of protest proceeding or election "on the annexation or taxation" issue.

But when the matter was considered on the merits after briefing and oral argument in August 2011, the result was different. The court determined Proposition 218 does not apply to " 'island' " annexations under the Government Code (specifically section 56375.3). The court further concluded the annexation of Sunset Beach by Huntington Beach would not "involve the imposition, extension or increase of any new general or special taxes." Rather, the taxes at issue had already "been established and approved by the electorate of Huntington Beach."

The trial court's thorough (three pages, single spaced, covering the parties' major arguments) minute order was filed August 18, 2011. But the minute order did not deal with the existing preliminary injunction that had been in effect since January 19.

The Citizens Association thought the status of that preliminary injunction was in need of clarification. Huntington Beach thought the denial of the petition for writ of mandate to be clear and self-executing. In any event, OC LAFCO didn't wait for further briefing. It filed its notice of completion of annexation four days later, on August 22. Two days after that, the trial court denied an ex parte request for a stay of execution of judgment pending appeal. The formal judgment was filed September 20, and the Citizens Association filed this appeal.

### III.  DISCUSSION

A.  *Mootness*

Respondent Huntington Beach argues the case is moot because the annexation is now final, but even so invites this court to reach the merits since the case is a matter of public interest and likely to arise anew. Respondent OC LAFCO, by contrast, apparently does not think the case is moot at all.

██  The case is not moot, because the Citizens Association raises a constitutional argument against the application of the annexation statutes to

Sunset Beach. If, indeed, Proposition 218 requires an election before either of the two Huntington Beach taxes at issue in this case may be applied to citizens of Sunset Beach, then it makes no difference whether the annexation itself is a fait accompli. Constitutions trump conflicting statutes. (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 800–801, fn. 11 [268 Cal.Rptr. 753, 789 P.2d 934].) Local governments cannot avoid application of a constitutional provision simply by ramming through an annexation to completion and then argue the constitutional provision doesn't apply to a fait accompli.

## B. *General Considerations*

Since this appeal centers on the possible application of Proposition 218, a constitutional provision enacted by initiative, our task is ascertaining the intent of the voters. "When construing a constitutional provision enacted by initiative, the intent of the voters is the paramount consideration." (*Davis v. City of Berkeley* (1990) 51 Cal.3d 227, 234 [272 Cal.Rptr. 139, 794 P.2d 897].) To determine intent, courts look first to the language of the provision, giving its words their ordinary meaning. If that language is clear in relation to the problem at hand, there is no need to go further. (*Ibid.*) If, on the other hand, the language is ambiguous, we turn to extrinsic indicia of voter intent, particularly what the ballot pamphlet said about the initiative. (*People v. Rizo* (2000) 22 Cal.4th 681, 685 [94 Cal.Rptr.2d 375, 996 P.2d 27].)

In construing the language of an initiative, we consider not only the ordinary meaning of the bare words, but how those words fit into the initiative as a whole. (*People v. Superior Court (Pearson)* (2010) 48 Cal.4th 564, 571 [107 Cal.Rptr.3d 265, 227 P.3d 858]; *Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1037 [56 Cal.Rptr.3d 814, 155 P.3d 226].) Here, the context is key.

Structurally, Proposition 218 sets up a dual system of voting on taxes. It contains two parallel subdivisions, now set forth respectively in article XIII C, section 2, subdivision (b) and article XIII C, section 2, subdivision (d), of the state Constitution. They govern two different kinds of taxes. The language in each subdivision is *almost* identical. A vote is required before a tax may be imposed, extended or increased. But the required quantum of support for the tax varies with the kind of tax being imposed, extended or increased. If, as provided for in subdivision (b), a tax is a "general" one, the quantum is a simple majority. But if the tax is "special," a supermajority of two-thirds is required.[6] We conclude this dual structure undercuts any argument there was

[6] Article XIII C, section 2, subdivision (b) of the state Constitution provides: "No local government may impose, extend, or increase any general tax unless and until that tax is submitted to the electorate and approved by a majority vote. A general tax shall not be deemed to have been increased if it is imposed at a rate not higher than the maximum rate so approved.

an intent to require a vote in connection with an annexation. But to explain our conclusion, a little history is needed.

Originally, section 4 of Proposition 13 passed in 1978 (Cal. Const., art. XIII A) provided that cities and counties "may" impose "special taxes" by a two-thirds vote. But four years later, in 1982, a divided Supreme Court upheld an increase in what was arguably a special tax by only 55 percent of the vote.[7] In 1986, in specific response to that particular Supreme Court decision, the backers of Proposition 13 placed Proposition 62 on the ballot.[8] Unlike Proposition 13 before it, Proposition 62 was a statutory initiative, not an amendment to the Constitution. Proposition 62 added sections 53721, 53722, and 53723 to the Government Code. Section 53721 specifies that all taxes "are either special taxes or general." Section 53722 states that all special taxes must be approved by two-thirds of the voters. And section 53723 states that no general tax may be imposed without a majority vote.

With the passage of Proposition 62 in 1986 came the possibility of a gallimaufry of differing tax regimes among California cities and counties. For example, voters in some counties could enact "special" sales taxes by a two-thirds supermajority to fund construction of county jails (cf. *Rider v. County of San Diego* (1991) 1 Cal.4th 1 [2 Cal.Rptr.2d 490, 820 P.2d 1000] (*Rider*)),[9] or to fund county transportation projects (cf. *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220 [45 Cal.Rptr.2d 207, 902 P.2d 225] (*Guardino*)).[10] Likewise county voters could impose "general" sales tax increases by majority vote to fund general county objectives (e.g., *Coleman v. County of Santa Clara* (1998) 64 Cal.App.4th 662

---

The election required by this subdivision shall be consolidated with a regularly scheduled general election for members of the governing body of the local government, except in cases of emergency declared by a unanimous vote of the governing body."

Article XIII C, section 2, subdivision (d) of the state Constitution provides: "No local government may impose, extend, or increase any special tax unless and until that tax is submitted to the electorate and approved by a two-thirds vote. A special tax shall not be deemed to have been increased if it is imposed at a rate not higher than the maximum rate so approved."

[7] The tax was a payroll and gross receipts tax passed by 55 percent of the voters in a June 1980 election. While the high court majority construed San Francisco's payroll and gross receipts tax not to be a special tax within the meaning of Proposition 13's section 4, the dissent thought that the majority adopted an overly "restricted interpretation of the term 'special tax.' " (*City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47, 53, 57 [184 Cal.Rptr. 713, 648 P.2d 935]; see *id.* at p. 57 (dis. opn. of Richardson, J.).)

[8] See *City of Westminster v. County of Orange* (1988) 204 Cal.App.3d 623, 637 [251 Cal.Rptr. 511]. Howard Jarvis himself was among the three writers of the ballot argument in favor of Proposition 62. (204 Cal.App.3d at p. 637.)

[9] In this case the sales tax failed because it only got 50.8 percent of the vote. (*Rider, supra,* 1 Cal.4th at p. 6.)

[10] Again, this particular sales tax increase failed because it fell short of the two-thirds needed, there receiving 54.1 percent. (See *Guardino, supra,* 11 Cal.4th at p. 228.)

[75 Cal.Rptr.2d 516] (*Coleman*).[11] And city voters might enact certain general taxes which could squeak by with a "bare majority" of the voters. (See *Neecke v. City of Mill Valley* (1995) 39 Cal.App.4th 946, 950–951 [46 Cal.Rptr.2d 266].)

This history suggests strongly that if there was any intent in Proposition 218 to provide for elections in connection with annexations, that intent would have manifested itself in some provision for the multitude of elections that would be required. While much of the briefing in this case centers on the assumed confluence between Proposition 218 and the *normal* requirement of a majority election when unincorporated county territory is annexed by a city (§ 57075), we cannot assume that an election on annexation is synonymous with an election on a tax. Some voters might wish to vote one way on the annexation and another way on the tax.

So, if Proposition 218 were intended to apply to annexations, up to three separate elections might be required any time an annexation occurred: first an election by majority vote on any general tax which the annexing jurisdiction had which the to-be-annexed territory did not have; second an election on any special tax which the annexing jurisdiction had and which the to-be-annexed territory did not have; and third—at least in the case of nonisland annexations—an election on the annexation per se.

And those are only the vanguard of the structural complications. Given the diversity of tax regimes among local governments contemplated by Proposition 62, some mechanism would also be needed to determine in the first place whether an annexation really would, or would not, result in additional taxes to be paid by the citizens of the to-be-annexed territory.[12] Beyond that, there would be the problem of ascertaining, before any vote required by Proposition 218, whether any tax differentials between the annexing jurisdiction and the annexed territory were to be classified as "special," requiring a two-thirds vote.

In short, there is much in the very structure of Proposition 218 that, if it had been intended to apply to annexations, should have been there, but isn't. Just as the silence of a dog trained to bark at intruders suggests the absence of intruders, this silence speaks loudly. It is indicative of a lack of voter intent to affect annexation law. (See *In re DirecTV Early Cancellation Litigation* (2010) 738 F.Supp.2d 1062, 1075 [citing the Arthur Conan Doyle short story, Silver Blaze (1892)].)

---

[11] Because the tax increase went for general purposes, this one passed with 51.8 percent of the vote. (*Coleman, supra,* 64 Cal.App.4th at p. 664.)

[12] For example, suppose a county had a business license tax that applied only to county territory, while the annexing city had no business license tax but did have a tax on cell phone calls. Would the annexation of county territory by the city result in a net increase or decrease in taxes—and for which taxpayers?

But quite apart from this context, the words themselves undermine appellant's position. Both subdivisions (b) and (d) of California Constitution, article XIII C use the same set of verbs—"may impose, extend, or increase." For the Citizens Association, the verbs "impose, extend, or increase" are unambiguous, and demand a simple application of Proposition 218's election requirements to the taxes at issue.

■ There is, however, a rule of construction—well known prior to the passage of Proposition 218—that courts are required to try to harmonize constitutional language with that of existing statutes if possible. (*Penziner v. West American Finance Co.* (1937) 10 Cal.2d 160, 174–178 [74 P.2d 252] [refusing to find implied repeal of 1918 statutory usury law by 1934 constitutional amendment]; *Metropolitan Water District v. Dorff* (1979) 98 Cal.App.3d 109, 114 [159 Cal.Rptr. 211] (*Dorff*).) Put another way, the implied repeal of statutes by later constitutional provisions is not favored. Accordingly, if it is possible to reconcile the language of Proposition 218 with the annexation statutes existing at the time of its passage, we must do so. (See *Dorff, supra*, 98 Cal.App.3d at p. 114.)

It turns out that at least two annexation statutes were on the books prior to the passage of Proposition 218 which would be impliedly repealed by a construction of the measure that required an election any time an annexation involved a negative tax differential between the annexed jurisdiction and the annexing jurisdiction.

One was the island annexation statute. The Citizens Association argues that involuntary "island annexations" were the product of amendments to the Government Code in 2000 enacting section 56375.3, hence Proposition 218 need not be harmonized with such involuntary annexations. Says the Citizens Association, "The island annexation statute, and the amendments accompanying it (Government Code sections 56375.3–56375.5), were not added to the Code until 2000," therefore "[i]t would have been impossible for the drafters of Proposition 218 to anticipate the island annexation law and make special provision for it." The argument, however, is not persuasive because involuntary island annexations long preexisted Proposition 218's enactment in 1996.

Involuntary annexations of relatively small parcels of territory have been a part of our state's statutory framework since 1939. (See *Weber v. City Council of Thousand Oaks* (1973) 9 Cal.3d 950, 962 [109 Cal.Rptr. 553, 513 P.2d 601] (*Weber*).) Before 1939, annexations were only for uninhabited contiguous territory. (*Ibid.*, citing Stats. 1899, ch. 41, p. 37; see Stats. 1939, ch. 297, § 1, pp. 1567–1568.) But beginning in 1939, the Legislature began amending annexation statutes to include territory with voters, first only three acres, then 12 acres, and in 1977 providing for involuntary annexations of territory not exceeding 100 acres. (See *Weber, supra*, 9 Cal.3d at p. 962; *I.S.L.E. v. County of Santa Clara* (1983) 147 Cal.App.3d 72, 75, fn. 2 [194 Cal.Rptr. 854]

[quoting former § 35150 as it stood in 1978].) "The entire island concept was introduced into the statute to prevent piecemeal annexation of large surrounded or substantially surrounded areas, thus prohibiting the circumvention of the 100-acre limitation and/or the annexation of smaller areas within larger substantially surrounded areas." (*Fig Garden Park No. 2 Assn. v. Local Agency Formation Com.* (1984) 162 Cal.App.3d 336, 343 [208 Cal.Rptr. 474].)

The 100-acre threshold was cut back to 75 acres by legislation in 1985 (the original Cortese Local Government Reorganization Act of 1985) with the codification of section 56375. The legislation still provided for annexations of islands "without an election." (Stats. 1985, ch. 541, § 3, pp. 1920, 1950 [enacting former § 56375].)

In 1996, on the eve of Proposition 218, section 56375 still gave local LAFCO's the power to allow annexation of unincorporated islands that did not exceed 75 acres to cities surrounding, or substantially surrounding, those islands without an election. (Stats. 1995, ch. 91, § 55, pp. 287, 289.) The amendments of 2000 simply gave the island annexation law its own code section. (See Stats. 2000, ch. 761, § 68.5, p. 5046.) Finally, in 2004, the then existing 75-acre threshold was increased to 150 acres. (Stats. 2004, ch. 95, § 1, p. 492.)

The island annexation statute works in combination with another statute, section 57330 (passed in 1993, three years prior to the passage of Prop. 218), which provides that "[a]ny territory annexed to a city or district *shall* be subject to the levying or fixing and collection of any previously authorized taxes . . . of the city . . . ." (Italics added.) Read together, the island annexation statute (in 1996, § 56375) and the automatic-taxation-of-annexed-territory-statute (in 1996, § 57330) would necessarily be repealed by any interpretation of Proposition 218 that required a vote whenever an "island" annexation involved a "taxpayer unfriendly" annexation.[13] But more would be repealed than just these two statutes. Even nonisland annexations would be impliedly repealed.

In nonisland annexations (now those involving territory over 150 acres), a protest procedure, and sometimes a vote, is required when one local government annexes territory. (See § 57075.) If a majority of the voters residing within the territory to be annexed file written protests (see § 57078) the annexation automatically terminates. If less than 25 percent of the voters file written protests, the annexation automatically goes through. But if at least 25

---

[13] And as we have discussed above, even figuring out whether an annexation is taxpayer friendly or taxpayer unfriendly itself presents a problem.

percent but not more than 50 percent file written protests, there must be an election, and that election is only by majority vote.[14]

But what happens when the annexing jurisdiction has a special tax originally passed with a two-thirds vote? As alluded to above, a majority vote on the annexation itself would be inadequate to account for Proposition 218's requirement that special taxes be passed with a two-thirds majority. We note in this regard that section 57330 makes no differentiation between "previously authorized" special taxes and general taxes, thus underscoring the point that if Proposition 218 had been intended to affect annexations, it would have needed some mechanism to accommodate the need for a supermajority vote for special taxes. Thus, at the very least, application of Proposition 218 to annexations would also result in the implied repeal of section 57075 when read in conjunction with section 57330.

Of course, Citizens Association is correct Proposition 218 *can* be read to effect the repeal of section 56375 (now § 56375.3) or sections 57075 and 57330. But for analytical purposes, the point is it does not *have* to be. (See *Dorff, supra*, 98 Cal.App.3d at p. 115 [declining to imply repeal of existing statutes where language was not "clear-cut."].) The words "impose," "extend" and "increase" all have meanings which would not necessarily apply to the tax effects of an annexation.

█ The word "impose" usually refers to the first enactment of a tax, as distinct from an extension through operation of a process such as annexation.[15] Huntington Beach's utility tax and property tax surcharge have already been imposed in this sense of the word. And the active voice syntax in California Constitution, article XIII C, section 2, subdivisions (b) and (d) ("No local government may impose, extend or increase . . . .") indicates the actual subject of the sentence is a local government, not an abstract *process* like an annexation conducted under the auspices of a county LAFCO.

---

[14] In the language of the statute, annexation is "subject to confirmation by the registered voters residing within the affected territory." (§ 57075, subd. (a)(2).) The vote is by a simple majority. (§ 57176.)

[15] Black's Law Dictionary defines "impose" as meaning "To levy or exact," which suggests a discrete, initiating event. (Black's Law Dict. (7th ed. 1999) p. 759, col. 2.) Similarly, the very first definition of "impose" in the exhaustive Oxford English Dictionary suggests an origination of a burden ("To lay on or set on; to place or set in a position; to put, place, or deposit") as does the definition given with specific reference to taxation ("To put or levy (a tax, price, etc.) on or upon (goods, etc.)"). (7 Oxford English Dict. (2d ed. 1989) pp. 730–731, italics omitted.)

The first three references to taxes being "imposed" in published opinions this year all use the word "impose" to refer to the time of a tax's *initial enactment*. (See *NetJets Aviation, Inc. v. Guillory* (2012) 207 Cal.App.4th 26, 32 [143 Cal.Rptr.3d 111]; *Diageo-Guinness USA, Inc. v. Board of Equalization* (2012) 205 Cal.App.4th 907, 913 [140 Cal.Rptr.3d 358]; *Goldman v. Franchise Tax Bd.* (2012) 202 Cal.App.4th 1193, 1203 [136 Cal.Rptr.3d 373].)

Similarly, "extend" is normally thought of in terms of time, not geographic areas, particularly in the context of taxation.[16] Here, there is no chronological *prolongation* of either the utility tax or the property tax surcharge.

And "increase" most often refers to a change in the amount of an existing tax *rate* a taxpayer owes, as figured on some sort of base (e.g., instead of paying 25 percent on $X net income, you pay 27 percent on $X net income). Here, the annexation is independent of the rates by which the utility tax and property tax surcharges are calculated.

Any doubt about our conclusion is removed by examination of the history behind Proposition 218. Its proponents simply never intended it to apply to annexations.

We begin with Proposition 13, passed in 1978. Section 1 of Proposition 13 contained language that indicated a two-thirds vote might be required for any special "assessments" made by a local government. (Cal. Const., art. XIII A, § 1, subd. (b).) While assessments levied by local governments are not, strictly speaking, the same as ordinary taxes, the proponents of Proposition 13, fearing the potential for abuse by local governments, wanted them treated as ordinary taxes. The problem was, Proposition 13's language on assessments was not well conceived. Proposition 13's basic 1 percent limit in section 1 did not mention special assessments; it only mentioned ad valorem property taxes. And, the two-thirds vote provision in section 4 only mentioned "special taxes," and did not use the words "assessments" or "special assessments." Consequently, a series of appellate court decisions between 1979 and 1982 held that Proposition 13 did not apply to special assessments.

The predictable result came to pass. As proponents of Proposition 218 would point out in 1996, special districts increased their assessments by over 2,400 percent over 15 years, while cities raised benefit assessments by almost 10 times. And so, in 1996, Proposition 218 was proposed as a constitutional amendment to plug the loophole the courts had discovered (or, depending on your point of view, punched) in Proposition 13 by allowing unrestricted special assessments.

Both sides submitted ballot materials. Ballot materials are windows into voter intent (see *Strong v. State Bd. of Equalization* (2007) 155 Cal.App.4th

---

[16] For example, this statement from a Web site called "Ballotpedia": "If Proposition 1A had passed, $10 billion in 'temporary' sales, use, income and vehicle taxes imposed as part of the 2009–2010 budget agreement would each have been *extended for one or two years*, resulting in a further tax increase of some $16 billion." (Italics added.) (Ballotpedia: Cal. Proposition 1A, Temporary Tax Increase (May 2009) <http://ballotpedia.org/wiki/index.php/California_Proposition_1A (May 2009)> (as of Oct. 5, 2012).

1182, 1188, fn. 3 [66 Cal.Rptr.3d 657]), and the words "annex" or "annexation" do not appear in Proposition 218, or in any of the ballot materials provided to the voters, pro, con, or otherwise.

The ballot arguments in favor of Proposition 218 emphasized the guarantee of the right to vote on taxes even if denominated "fees," including the right to vote on utility taxes. ("Proposition 218 guarantees your right to vote on taxes imposed on your water, gas, electric, and telephone bills." (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) argument in favor of Prop. 218, p. 76.)) They also emphasized that Proposition 218 was necessary to do what Proposition 13's backers hoped would have been accomplished in the first place. ("Proposition 218 simply extends the long standing constitutional protection against politicians imposing tax increases without voter approval." (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) argument in favor of Prop. 218, p. 76.))

The main emphasis was on plugging the loophole that allowed assessments to be imposed without a vote: "After voters passed Proposition 13, politicians created a loophole in the law that allows them to raise *taxes without voter approval by calling taxes 'assessments' and 'fees.'* [¶] Once this loophole was created, one lawyer working with politicians wrote, assessments 'are now limited only by the limits of human imagination.' [¶] How imaginative can the politicians be with assessments? Here are a few examples among thousands: . . . ." (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) argument in favor of Prop. 218, p. 76, italics added.) The ballot argument then listed as among the abuses of assessments a "view tax," assessments for an equestrian center, assessments for a park 27 miles away, and for a college football field in the Central Valley.

The rebuttal to the argument in favor of Proposition 218 focused largely on the mechanics of the measure's voting provisions, in which votes on assessments are proportional to a landowner's exposure to the assessment. Thus the phrase "voting power" was a main argument in the rebuttal, stressing that Proposition 218 could reduce the "voting power" of nonlandowners. (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) argument against Prop. 218, p. 77.) The rebuttal also emphasized the prospect of service cutbacks, and the inability of local governments to impose emergency assessments in the wake of "earthquakes, floods and fires." (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) argument against Prop. 218, p. 77.) And, echoing a point also made by the analyst, the rebuttal stressed that Proposition 218 would require more elections and hence generate its own administrative costs.

In response, the backers of Proposition 218 repeated the theme that Proposition 218 would not have been necessary at all except for the interim circumvention of Proposition 13. ("Proposition 218 simply gives taxpayers the right to vote on taxes and stops politicians' end-runs around Proposition 13." (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) rebuttal to argument against

Prop. 218, p. 77.)) They ended with the general theme of voting on taxes. ("Do you believe taxpayers should have the right to vote on taxes?" (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) rebuttal to argument against Prop. 218, p. 77, some capitalization omitted.))[17]

In none of this do we find any discussion—any mention—of annexation.[18] Proposition 218's silence on the subject of annexations is indicative of the voters' understanding of what they were doing.[19] The gravamen of the proposition was ending what its proponents saw as the end-run around Proposition 13 by the gambit of imposing special assessments without any vote at all. Annexations were simply not on the radar of the initiative's proponents.

But if the ballot arguments are not clear enough, the existence of the *Dorff* case, decided in 1979, shows plainly that Proposition 218 was not intended to apply to the tax effects of annexations. More than a decade and a half *prior* to Proposition 218, *Dorff* directly held that Proposition 13 did not preclude the application of a preexisting property tax to land previously not part of an annexing water district to pay for that water district's outstanding obligations.

As in the case before us, in *Dorff* the *effect* of the annexation was to apply a preexisting tax to property previously free of that tax. But the court noted Proposition 13 had not directly addressed the problem of whether its exception for payment of indebtedness approved before Proposition 13 applied only to property subject to such taxation before its date. The *Dorff* court reasoned the absence of "a more clear-cut mandate" on the issue did not prohibit the levy of the annexing water district's tax to the parcels being annexed. (*Dorff, supra*, 98 Cal.App.3d at p. 115.)

*Dorff* recognized that annexations could have possible adverse tax effects on property being annexed, and these adverse tax effects *were known as early as 1979*, and courts had held them not to offend Proposition 13. Had

---

[17] The ballot materials were considered by the trial court and are thus part of the regular appellate record. Huntington Beach also filed in this court, on March 26, 2012, an unopposed request for judicial notice of various related legislative materials. The motion is granted as to all materials therein.

[18] There are no references to annexations in the Legislative Analyst's summary either.

[19] We realize, of course, that ballot arguments are subject to word limits, so ballot arguments cannot cover all situations where a measure might apply. Even so, total silence on a subject can indeed be indicative of an absence of intent to affect that subject. As the Supreme Court said in *Penziner* about the possible implied repeal of an earlier usury statute by a later constitutional amendment: "It is quite significant that in the *argument* in support of the *an intent to repeal the usury law.* . . . It is quite unlikely that if the legislature in drafting, and the people in adopting, the constitutional provision had *intended* it to repeal the usury law, such *intent would not have been clearly expressed.*" (*Penziner, supra*, 10 Cal.2d at p. 178, original italics omitted, italics added.)

Proposition 218 been intended to satisfy or avoid the effects of *Dorff*, we would have expected *some* attempt somewhere in Proposition 218 to address the issue. We have found none.

The Citizens Association relies on *AB Cellular LA, LLC v. City of Los Angeles* (2007) 150 Cal.App.4th 747 [59 Cal.Rptr.3d 295] (*AB Cellular*) for the proposition that the tax effects of annexation require a vote under Proposition 218. But *AB Cellular* is not an annexation case involving the application of a tax to a new territory. It is a calculation case, in which the same electorate kept paying the same tax, only more of it. *AB Cellular* involved the methodology of how, and on how much air time, a city collected its cell phone tax. The court held the *methodology* of calculation had changed, requiring a Proposition 218 election.

The *AB Cellular* court used the phrase "tax base" to refer to the quantum of cell phone calls that would be subject to the city's tax, much the same way that the income tax requires taxpayers to pay a tax on wages but not gifts. (*AB Cellular, supra*, 150 Cal.App.4th at p. 756.) So, for example, the city's "tax base" for purposes of the cell phone tax went from calls originating and terminating within the city to simply all calls, or "air time." (*AB Cellular, supra*, 150 Cal.App.4th at p. 753.) In that context, the court observed: "In practical terms, a tax is increased if the math behind it is altered so that either a larger tax rate or a larger tax base is part of the calculation." (*Id.* at p. 763.)

To be sure, one could say that Huntington Beach's "tax base" has been increased (one might as well also say extended) by the addition of Sunset Beach. But application of the very different "tax base" terminology of *AB Cellular* to annexations is anything but clear cut. As used in *AB Cellular*, the phrase "tax base" applied to a "base" of cell phone calls, not the extension of a city's boundaries by an annexation statute. While the case would be compatible with the application of Proposition 218 to annexations, it does not compel that result. And given the problems of structure and implied repeal discussed above, we decline to extend the rule of *AB Cellular* to annexations.

In all of this, we are not unmindful that section 5 of Proposition 218 requires liberal construction "to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent." But, a rule of liberal construction cannot trump the rule against implied repeal, much less require us to blind ourselves to the history and language of the proposition. The very structure of Proposition 218—which would have had to take into account the difference between two-thirds requirement for special taxes and a majority requirement for ordinary taxes—is simply inimical to its application.

One other loose end remains. County LAFCO's have the *discretionary* authority to condition annexations upon "the approval by the voters of

general or special taxes." (§ 56886, subd. (s) [using "may"]; accord, 89 Ops.Cal.Atty.Gen. 173, 174 (the "Sansone Opinion") [county LAFCO has authority to condition approval of incorporation of a city upon approval by city's voters of a general tax for the proposed city].) On the other hand, LAFCO's *must* approve "island" annexation if the relevant criteria are present (§ 56375.3, subd. (a) [using "shall"]), the idea being that island annexations must be allowed without elections. The question thus arises as to whether OC LAFCO might have conditioned the annexation of Sunset Beach by Huntington Beach on a vote by the citizens of Sunset Beach on the two "new" taxes which would apply to them in the wake of annexation.

■ The question is academic here. The theory of the Citizens Association has been that the annexation statute can only be reconciled with Proposition 218 by *compelling* OC LAFCO to condition the annexation on a vote. However, since Proposition 218 does not apply to annexations of either the voted-on or involuntary island variety, there was no constitutional *compulsion* to hold an election. Whether OC LAFCO *could have* conditioned annexation on approval of the voters is not properly before us.

## IV.   DISPOSITION

■ The trial court was correct. Proposition 218 does not apply to annexations. The judgment is affirmed. Respondents shall recover their costs on appeal.

Rylaarsdam, Acting P. J., and Aronson, J., concurred.

A petition for a rehearing was denied October 31, 2012, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied January 3, 2013, S206596.