Filed 6/4/25; Modified & Certified for Publication 6/30/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| STEVE ROGERS, | |
| Plaintiff and Appellant, | G063580 |
| v. | (Super. Ct. No. CIVSB2126031) |
| CITY OF REDLANDS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of San Bernardino County, Joseph T. Ortiz, Judge. Affirmed.

Benink & Slavens, Eric J. Benink and Vincent D. Slavens; Kearney Littlefield, Thomas A. Kearney and Prescott W. Littlefield for Plaintiff and Appellant Steve Rogers.

Colantuono, Highsmith & Whatley, Michael G. Colantuono and Meghan A. Wharton for Defendant and Appellant City of Redlands.

Best Best & Krieger, Lutfi Kharuf, Chloe Graham and Dean S. Atyia for League of California Cities, California State Association of Counties, and California Special Districts Association as Amici Curiae on behalf of Defendant and Appellant City of Redlands.

\* \* \*

Plaintiff Steve Rogers filed this action against defendant City of Redlands (the City). Rogers alleged the rates for the City's solid waste collection embedded a surcharge for a City program to repair roads, which Rogers said violated Vehicle Code section 9400.8 (all undesignated statutory references are to this code). In phase one of a bifurcated trial, the trial court determined section 9400.8 was violated. In phase two, the trial court determined refunds were limited to those who paid under protest pursuant to Health and Safety Code section 5472. The City and Rogers appealed. The City contests the phase one ruling and Rogers contests the phase two ruling. We conclude the trial court did not err in either ruling and affirm.

FACTUAL AND PROCEDURAL HISTORY

The City's solid waste division operates a solid waste collection and disposal system. The City imposes bi-monthly rates on its solid waste customers, with the rate scale generally varying depending on volume.

In 2012, the City's municipal utilities and engineering department developed a pavement management program (PMP). The PMP "identifies a schedule for maintenance and reconstruction of City streets at the appropriate time intervals in order to extend their overall life-expectancy in the most efficient and economical manner" and "establishes a comprehensive process to prioritize rehabilitation of the City's roadway system" that "will be used in the [decisionmaking] process in order to best utilize the City's available financial resources."

2

The City also retained TKE Engineering, Inc. (TKE) to perform a pavement analysis report, which TKE issued in September 2012. TKE found there was "an annualized City wide total of $3,622,150 of street related damage from refuse vehicle impact loads and $119,500 from City utility vehicle impact loads." TKE identified, inter alia, typical vehicle load factors and "calculated typical annual vehicle loads imparted on residential, collector and arterial streets." As part of its work, TKE estimated traffic volume for each type of street and different types of vehicles.

In September 2012, the City adopted Resolution No. 7219 approving the pavement accelerated repair implementation strategy (PARIS) program and authorizing certain fund transfers to defray repair costs incurred by the City. The resolution stated, inter alia, "traffic associated with the [c]ity's solid waste, water and wastewater enterprise funded vehicles . . . places a significant burden on the City streets and is a significant cause of street damage"; "it is the intent of the City Council to establish by this resolution a fair and equitable method of securing a portion of the funds necessary to repair the damage caused to City streets as a result of [the City's solid waste, water and wastewater enterprise funded vehicles] to preserve acceptable pavement conditions throughout the City"; and "the City Council has determined that the costs incurred by the City for such street repair resulting from [the City's solid waste, water and wastewater enterprise funded vehicles] should be defrayed by the annual transfer of funds from the City's enterprise funds to the general fund to pay for at least a portion of those costs." The resolution "direct[ed] staff to transfer and utilize solid waste funds totaling $3.62 million annually, commencing in FY 2012-2013, to the City-wide street paving program to pay for the impacts and damages to City streets caused by the City's solid waste vehicles" and "direct[ed] the City

3

Attorney to prepare an ordinance for the City Council's consideration to implement the recommended solid waste rate adjustments set forth in the report necessary to recover the costs associated with damages from solid waste vehicles and for the City staff to issue the required Proposition 218[1] notice for a public hearing." The resolution also "direct[ed] staff to commence the design of, and to implement, the City-wide repair pavement program utilizing available funds as described and outlined in this Resolution and the Attached reports."

In 2017, the City adopted Ordinance No. 2852, which established bi-monthly rates for solid waste customers in 2017, 2018, and 2019 (and also provided for potential increases in the rates in 2020 and 2021 based on the consumer price index). In its answer, the City stated "Ordinance No. 2852's charges recover part of the cost of the PARIS program, and that some revenues from these charges are maintained in the Solid Waste Services Fund 511."[2] The City also stated in its answer "the funds supporting the PARIS program are maintained and accounted for in the City's PARIS Fund 211, and that Fund 211 is funded from the City's solid waste, water, and wastewater enterprises, as well as Measure I and Senate Bill [No.] 1 tax

---

[1] Proposition 218 was approved by voters in 1996. It "added articles XIII C and XIII D to the California Constitution. Article XIII C concerns voter approval for local government general taxes and special taxes. Article XIII D sets forth procedures, requirements and voter approval mechanisms for local government assessments, fees and charges." (*Howard Jarvis Taxpayers Assn. v. City of Roseville* (2002) 97 Cal.App.4th 637, 640 (*Roseville*).)

[2] The record also contains one of the City's solid waste rate models, dated December 9, 2016, which includes PARIS expenses.

4

proceeds." In an interrogatory response, the City identified the amount of money it had transferred from Fund 511 to Fund 211 from 2018 to 2021.

In 2021, Rogers filed a petition for writ of mandate and complaint for declaratory relief and refund of illegal fees and charges. Rogers alleged a putative class action and asserted causes of action for a writ of mandate, declaratory relief, and claim for refund.

The action was bifurcated, with phase one addressing the following: "To the extent that solid waste collection rates established and fixed on October 10, 2017 via Ordinance No. 2852 were calculated to fund interfund transfers for the PARIS program, are the solid waste collection rates charges for the privilege of using the [c]ity's streets or highways within the meaning of . . . section 9400.8?" For phase one, the trial court concluded "the PARIS surcharge constitutes a charge for the privilege of using the [c]ity's streets within the meaning of . . . section 9400.8."

For phase two,[3] the trial court addressed certain issues related to the remedy. The trial court determined Health and Safety Code section 5472 "does, in fact, limit refunds to those who paid under protest," and the retrospective remedies sought by Rogers under section 9400.8 were unavailable.

The trial court entered judgment, granting the petition for writ of mandate based on the City's violation of section 9400.8 and issuing a peremptory writ of mandate commanding the City to "cease and desist the imposition of solid waste collection rates and charges to the extent they fund

[3] Rogers had filed a first amended verified petition for writ of mandate and complaint prior to the completion of phase two, which added a cause of action under Code of Civil Procedure section 526a.

5

[the City's PARIS] Program or similar street repair program." The trial court "declare[d] that the PARIS surcharge is illegal because it is a charge for the privilege of using the City's streets within the meaning of" section 9400.8.[4] The trial court also ordered "Rogers shall take nothing on his third cause of action for refund" and "shall take nothing on his fourth cause of action for injunction pursuant to Code of Civil Procedure section 526a."[5] Both the City and Rogers appealed.

## DISCUSSION

On appeal, the City contends the trial court erred in its phase one ruling, and Rogers argues the trial court erred in its phase two ruling.[6] We conclude the trial court did not err.

### I.

### STANDARD OF REVIEW

"'''''When we interpret a statute, '[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and

---

[4] The trial court denied the petition for writ of mandate and the cause of action for declaratory relief to the extent they were based on alleged violations of article XIII D, section 6 of the California Constitution.

[5] The trial court also dismissed all Doe defendants without prejudice and found Rogers to be the prevailing party and entitled to his costs.

[6] The League of California Cities, California State Association of Counties, and California Special Districts Association filed an amici curiae brief in support of the City's contention.

6

purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' [Citation.] 'Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose.'"'" [Citation.] The interpretation of a statute presents a question of law that this court reviews de novo.'" (*Segal v. ASICS America Corp.* (2022) 12 Cal.5th 651, 662.)

## II.

### SECTION 9400.8

Section 9400.8 provides: "Notwithstanding any other provision of law, if the voters approve Senate Constitutional Amendment [No.] 1 of the 1989–90 Regular Session,[7] no local agency may impose a tax, permit fee, or other charge for the privilege of using its streets or highways, other than a permit fee for extra legal loads, after December 31, 1990, unless the local agency had imposed the fee prior to June 1, 1989." Relying on *Kern, supra*, 127 Cal.App.4th 1544, the trial court found the PARIS surcharge to be a "charge for the privilege of using the City's streets" under section 9400.8.

---

[7] "This statutory provision became operative because voters approved Senate Constitutional Amendment No. 1 of the 1989–1990 Regular Session (Prop. 111) at the June 5, 1990, primary election." (*County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544, 1615, fn. 76 (*Kern*).)

On appeal, both parties focus on whether *Kern* applies here. In that case, the county enacted a biosolids impact fee, which was a $3.37 fee per ton of biosolids applied to land within the county and was "'for mitigating the impacts to the Kern County infrastructure shown to be caused by the transport of [b]iosolids.'" (*Kern, supra*, 127 Cal.App.4th at p. 1571.) One of the issues on appeal was whether section 9400.8 barred the biosolids impact fee. (*Id.* at p. 1616.) The county did not dispute the biosolids impact fee was a "'permit fee or other charge'" under section 9400.8; instead, it argued "the fee was not for road use, but was a bona fide impact fee: 'The fee [was] imposed only on permittees to recover the costs for repairing damage or upgrading county roads due to the incremental increase in truck traffic transporting biosolids to be land applied in Kern County.'" (*Id.* at p. 1619.)

The Court of Appeal in *Kern* disagreed with the county's attempt to distinguish a fee for the privilege of using roads from a fee "'for mitigating the impacts to . . . [the] [c]ounty infrastructure shown to be caused by the transport of [b]iosolids.'" (*Kern, supra*, 127 Cal.App.4th at p. 1620.) The appellate court reasoned: "Webster's Third New International Dictionary (1986), page 2524, states the verb 'use' 'is general and indicates any putting to service of a thing, usu. for an intended or fit purpose . . . .' This definition is quite broad because it covers '*any* putting to service' (italics added). If the Legislature employed the literal meaning of this definition, then the 'privilege of using' a road would cover the privilege of putting that road to service. Because trucks hauling loads within the legal weight limit are putting to service the roads over which they travel and they have the privilege of traveling over those roads as a result of being properly licensed and registered, it follows that a literal reading of the phrase . . . 'the privilege of using [a county's] streets or highways' includes driving a truck on a road

8

even if it causes incremental damage to the road. In other words, a road maintenance or impact fee is simply one type of fee for the privilege of using a road." (*Ibid.*)

Additionally, the *Kern* court considered whether its interpretation "comports with, or frustrates, the purpose of the statutory scheme" (*Kern, supra*, 127 Cal.App.4th at p. 1620), concluding it was consistent with the statutory scheme (*id.* at pp. 1621–1622). The court noted "neither . . . section 9400.8 nor the remainder of article 3 of chapter 6 of division 3 of the Vehicle Code—which addresses weight fees assessed at vehicle registration—contains an express exception for local fees or charges that attempt to recover damage to streets or highways caused by vehicle use." (*Id.* at p. 1621.) The *Kern* court concluded "such an exception cannot be implied." (*Ibid.*) The court further noted "it appears that . . . section 9400.8 is part of a statutory scheme that regulates fees based on vehicle weight" and "[t]his statutory scheme as set forth in article 3 of chapter 6 of division 3 of the Vehicle Code, and the Legislature's statement in the legislation that added section 9400.8 to the Vehicle Code that '[n]othing in this act shall be construed to allow local governments to impose fees not otherwise authorized by statute' [citation], support the conclusion that the Legislature intended to fully occupy the field of fees related to the weight of vehicles carrying legal loads." (*Ibid.*)

Thus, in *Kern* the court concluded "section 9400.8 must be construed to prohibit a local agency from imposing fees or charges on legal loads that are hauled on its roads, even though hauling such loads may cause damage beyond minor wear and tear to the roads." (*Kern, supra*, 127 Cal.App.4th at p. 1622.) Moreover, the *Kern* court found the biosolids impact fee in that case was the type of fee prohibited by section 9400.8 even though

9

it was not, on its face, assessed based on miles driven on roads and instead was based primarily on tons of certain biosolids applied to land in the county. (*Kern*, at p. 1622.) The court reasoned, "[a]lthough this basis of assessment is attenuated from actual road use, that attenuation is insufficient to save the entire biosolids impact fee." (*Ibid.*) Thus the court concluded, "[b]ecause the primary purpose of the biosolids impact fee was to collect funds based on the use of streets or highways located in Kern County, it violated . . . section 9400.8." (*Id.* at p. 1623.) As to the remedy, the court noted, "[a]lthough the primary purpose of the biosolids impact fee was to pay for road repair and maintenance, that was not its exclusive purpose," and "the money generated by the biosolids impact fee and other permit fees would be available to fund a number of different uses, some of which were not related to the impact of hauling biosolids over [c]ounty roads." (*Ibid.*) The court held "the appropriate relief when a fee is imposed for both valid and invalid purposes is to uphold the fee to the extent that the funds generated are applied to valid purposes and those purposes are otherwise severable from the invalid ones." (*Ibid.*)

We find *Kern* to be persuasive. As an initial matter, we agree with *Kern* "a road maintenance or impact fee is simply one type of fee for the privilege of using a road," and as such violates section 9400.8. (*Kern, supra*, 127 Cal.App.4th at p. 1620.) We turn next to whether the charge at issue here is a type of fee prohibited by section 9400.8. The City attempts to frame the issue as Rogers paying a fee for trash service based on volume of trash, not a fee for using City streets. However, the rate Rogers pays for trash service here incorporates, in part, the charge for the PARIS program. Specifically, as borne out by the record, the charge for the PARIS program is

10

based on the estimated damage done to the roads by garbage trucks[8]—that cost was factored into the total costs of the trash service and effectively passed on to the customers in their rates, and after the customers pay their rates, some of the money is then transferred to the PARIS program. Under the circumstances here, we reach the same conclusion as the trial court's conclusion the charge for the PARIS Program was a "charge for the privilege of using" the City's streets or highways under section 9400.8.

The City cites cases concerning Proposition 218, which the City argues permits utility charges to "recover costs for services provided by a city if those costs are demonstrated and reasonable." Relying on *Roseville* and *Howard Jarvis Taxpayers Assn. v. City of Fresno* (2005) 127 Cal.App.4th 914 (*Fresno*), the City asserts the recovery of street repair is one of the costs it can recover. The City highlights in *Roseville*, the appellate court stated "Roseville may charge its water, sewer, and refuse utilities for the street, alley and right-of-way costs attributed to the utilities; and Roseville may transfer these revenues to its general fund to pay for such costs (the general fund supports or pays for Roseville's streets, alleys, and rights-of-way)." (*Roseville, supra*, 97 Cal.App.4th at p. 648 [but concluding Proposition 218 was violated because "there has been no showing that the in-lieu fee reasonably represents these costs"]; see also *Fresno, supra*, at pp. 921–922 [stating "there is an added cost of repair required by the transit of garbage

---

[8] The City argues its does not have weight-based fees. However, weight was a factor in calculating the estimate of the charge for the PARIS program. Indeed, the City concedes "[i]t is true that, in apportioning costs to the trash service utility, the City's engineering consultant measured road wear and tear by examining the weight of the categories of vehicles using them—this is just physics; heavier trucks do more damage."

11

trucks over streets and highways" and "[s]uch costs are real, even if minimal and difficult to calculate precisely"].) The City's argument, however, is unavailing as neither *Roseville* nor *Fresno* addressed section 9400.8. (See *Smith v. Myers* (2024) 103 Cal.App.5th 586, 599 [noting "'[i]t is axiomatic that cases are not authority for propositions that are not considered'"].)

According to the City, Proposition 218 and section 9400.8 should be harmonized by allowing the trash utility to recover all service costs, including costs to repair streets. "[C]ourts are required to try to harmonize constitutional language with that of existing statutes if possible[,]" and "the implied repeal of statutes by later constitutional provisions is not favored." (*Citizens Assn. of Sunset Beach v. Orange County Local Agency Formation Com.* (2012) 209 Cal.App.4th 1182, 1192.) Article XIII D, section 1, of the California Constitution states "[n]othing in this article or Article XIII C shall be construed to: (a) Provide any new authority to any agency to impose a tax, assessment, fee, or charge." When Proposition 218 was approved in 1996, section 9400.8 had been in effect for six years and prohibited charges such as the one for the PARIS program. Thus, our interpretation is harmonized—i.e., section 9400.8 barred the charge for the PARIS program here, and Proposition 218 did not create new authority impliedly repealing that prohibition.

III.

HEALTH AND SAFETY CODE SECTION 5472

Health and Safety Code section 5472 provides: "After fees, rates, tolls, rentals or other charges are fixed pursuant to this article, any person may pay such fees, rates, tolls, rentals or other charges under protest and bring an action against the city or city and county in the superior court to recover any money which the legislative body refuses to refund. Payments

12

made and actions brought under this section, shall be made and brought in the manner provided for payment of taxes under protest and actions for refund thereof in Article 2, Chapter 5, Part 9, of Division 1 of the Revenue and Taxation Code, insofar as those provisions are applicable." In phase two of the trial here, the trial court found Health and Safety Code section 5472 applied and limited refunds to those who paid under protest. On appeal, Rogers argues Health and Safety Code section 5472 does not apply to the charge for the PARIS program.[9]

Health and Safety Code section 5472 applies to challenges to "fees, rates, tolls, rentals or other charges" that are "fixed pursuant to this article." "By its plain language, the article where [Health and Safety Code] section 5472 appears (art. 4 of the Health and [Safety] Code, regulating 'sanitation and sewerage systems') applies to garbage collection." (*Padilla v. City of San Jose* (2022) 78 Cal.App.5th 1073, 1078.) Notably, Health and Safety Code section 5470, subdivision (f), defines "'[r]ates or charges'" to "mean fees, tolls, rates, rentals, or other charges for services and facilities furnished by an entity in connection with its sanitation or sewerage systems, including garbage and refuse collection." Additionally, Health and Safety Code section 5471, subdivision (a), provides, "[i]n addition to the powers granted in the principal act, any entity shall have power, by an ordinance or resolution approved by a two-thirds vote of the members of the legislative body thereof, to prescribe, revise and collect, fees, tolls, rates, rentals, or other charges for services and facilities furnished by it, either within or without its territorial limits, in connection with its water, sanitation, storm drainage, or sewerage system." Under these sections, charges for the PARIS

---

[9] Rogers does not argue on appeal he paid under protest.

13

program would fall within the charges subject to Health and Safety Code section 5472.[10] (See *Padilla, supra*, at p. 1078 [noting "[t]he Legislature was clear that the charges described by section 5472 include those for garbage collection"].)

Rogers contends "[a] fair interpretation of 'services' as used in [Health and Safety Code] section 5470, subdivision (f) and section 5471, subdivision (a) is that it means those activities required for the 'maintenance and operation' of physical systems and facilities." According to Rogers, such an interpretation would align with his assertion "that local agencies are already vested with the authority to establish solid waste handling fees and charges, i.e., fees for trash collection services," under Public Resources Code section 40059, subdivision (a)(1). We disagree. It is not a reasonable interpretation of Health and Safety Code sections 5470, subdivision (f), and 5471, subdivision (a), that rates or charges are limited solely to maintenance and operation of physical systems and facilities. Moreover, whether a local agency could also recover charges under a different code does not override the plain language of Health and Safety Code sections 5470, subdivision (f), and 5471, subdivision (a).

Relying on Health and Safety Code section 5471, subdivision (c), Rogers argues the types of authorized fees within article 4 "are limited to those that fund sanitation *facilities*." However, subdivision (c) of Health and

---

[10] Health and Safety Code sections 5470 and 5471 do not change our conclusion regarding the application of Vehicle Code section 9400.8 discussed, *ante*, as the more specific and later-enacted Vehicle Code section 9400.8 applies to bar the charge for the PARIS program. (See *Woods v. Young* (1991) 53 Cal.3d 315, 324 ["a later, more specific statute controls over an earlier, general statute"].)

14

Safety Code section 5471[11] sets forth how "[r]evenues derived under the provisions in this section" *shall be spent* while Health and Safety Code section 5472 describes the rates or charges fixed pursuant article 4, which include those pertaining to the collection of garbage.[12] Thus, considering the relevant statutory language, we conclude, as did the trial court, Health and Safety Code section 5472 applies to the charge for the PARIS program.

---

[11] Health and Safety Code section 5471, subdivision (c) provides, inter alia, "[r]evenues derived under the provisions in this section, shall be used only for the acquisition, construction, reconstruction, maintenance, and operation of water systems and sanitation, storm drainage, or sewerage facilities, to repay principal and interest on bonds issued for the construction or reconstruction of these water systems and sanitary, storm drainage, or sewerage facilities and to repay federal or state loans or advances made to the entity for the construction or reconstruction of water systems and sanitary, storm drainage, or sewerage facilities. However, the revenue shall not be used for the acquisition or construction of new local street sewers or laterals as distinguished from main trunk, interceptor, and outfall sewers."

[12] Given our conclusion, we need not determine whether Rogers is correct in his interpretation regarding the supposed limitation to how revenues are spent under Health and Safety Code section 5471, subdivision (c).

## DISPOSITION

The judgment is affirmed. The parties are to bear their own costs on appeal.


MOTOIKE, J.

WE CONCUR:


O'LEARY, P. J.


GOODING, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| STEVE ROGERS, | |
| Plaintiff and Appellant, | G063580 |
| v. | (Super. Ct. No. CIVSB2126031) |
| CITY OF REDLANDS, | ORDER MODIFYING OPINION, DENYING PETITION FOR REHEARING, AND GRANTING PUBLICATION; NO CHANGE IN JUDGMENT |
| Defendant and Appellant. | |

It is hereby ordered that our opinion filed on June 4, 2025, be modified as follows:

1. On page 8, first paragraph, the sentence beginning with "One of the issues on appeal" and that sentence's immediately following citation "(*Id.* at p. 1616.)" are deleted and replaced with the following sentence and citation:

> One of the issues on appeal was whether section 9400.8
> barred the biosolids impact fee, and the Court of Appeal in

*Kern* ultimately concluded the biosolids impact fee was preempted. (*Id*. at pp. 1616, 1618–1623.)

2. On page 11, sixth line from the top, the word "Program" is changed to "program" so the sentence reads:

> Under the circumstances here, we reach the same conclusion as the trial court's conclusion the charge for the PARIS program was a "charge for the privilege of using" the City's streets or highways under section 9400.8.

These modifications do not result in a change in the judgment. The petition for rehearing is DENIED.

Steve Rogers has requested that certain portions of our opinion be certified for publication. It appears that our opinion in its entirety meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED, and on the court's own motion, the opinion in its entirety is ordered published in the Official Reports.


MOTOIKE, J.

WE CONCUR:


O'LEARY, P. J.


GOODING, J.

18