Filed 10/1/19
*See Dissenting Opinion*

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| B.M., | |
| Petitioner, | E072265 |
| v. | (Super.Ct.No. RIJ1301366) |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | OPINION |
| Respondent; | |
| THE PEOPLE, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDING; petition for writ of mandate. Roger A. Luebs, Judge. Petition granted.

Steven L. Harmon, Public Defender and David J. Macher, Deputy Public Defender, for Petitioner.

Michael A. Hestrin, District Attorney and Robert A. Hightower, Deputy District Attorney, for Real Party in Interest.

This case concerns the validity of a recent law that raises the minimum age at which a juvenile can be tried in criminal court. The new law amends a provision of the "Public Safety and Rehabilitation Act" (Proposition 57), which the voters approved in 2016 with the express goals of reducing prison spending, emphasizing rehabilitation for youth offenders, and limiting prosecutorial authority over the decision to try a minor as an adult. To advance these goals, Proposition 57 eliminated prosecutors' ability to directly file charges against minors ages 14 to 17 in criminal court, requiring them instead to seek the juvenile court's permission by way of a transfer hearing.[1] Proposition 57 authorized legislative amendments that are "consistent with and further [its] intent." (Ballot Pamp., Gen. Elec. (Nov. 8, 2016) (Ballot Pamp.) text of Prop. 57, § 5, p. 145.) In 2018, the Legislature enacted the law at issue here, Senate Bill Number 1391 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1012, § 1) (SB 1391), which eliminates prosecutors' ability to seek transfer hearings for 14 and 15 year olds, effectively raising the minimum age a child can be tried as an adult from 14 to 16.

The change affected B.M.'s prosecution for murder. SB 1391 became effective after the Riverside County District Attorney had filed a wardship petition against the then 15-year-old and had moved to transfer her to criminal court. While the transfer motion was pending, the juvenile court (respondent Riverside County Superior Court) ruled the new law is invalid because it does not further what it identified as Proposition 57's goal of giving judges the authority to transfer 14 to 17 year olds to criminal court. B.M. filed

---

[1] For simplicity, when we make unqualified references to a minor's age, we mean their age at the time of their alleged offense.

2

a petition for a writ of mandate arguing the court misinterpreted Proposition 57's purpose in declaring SB 1391 invalid. We agree.

The juvenile court's error was to interpret Proposition 57's transfer hearing requirement as a purpose in and of itself, instead of a *means* to further the purpose of limiting prosecutorial charging discretion. As we explain, we conclude SB 1391 furthers each of Proposition 57's express purposes, including the one concerned with limiting prosecutorial discretion. We will therefore grant B.M.'s petition for a writ of mandate and direct the juvenile court to vacate its order declaring SB 1391 invalid.

# I

## FACTS

The voters approved Proposition 57 in November 2016. On April 6, 2018, the Riverside County District Attorney filed a wardship petition against B.M., alleging she had committed special circumstances arson-murder. (Welf. & Inst. Code, § 602, unlabeled statutory citations refer to this code; Pen. Code, §§ 187, 190.2, subd. (a)(17)(H).) Along with the petition, the district attorney requested a transfer hearing, arguing B.M. was unfit for the juvenile justice system.

B.M.'s case was continued for several months, and meanwhile in September 2018, the Legislature passed and the Governor approved SB 1391, which eliminated prosecutors' ability to seek transfer hearings for 14 and 15 year olds. The Legislature declared SB 1391 "is consistent with and furthers the intent of Proposition 57." (Stats. 2018, ch. 1012, § 3.) In his signing statement, the Governor acknowledged raising the

transfer age to 16 would mitigate the consequences for 14 and 15 year olds who had committed "very serious crimes," but concluded rehabilitating those young offenders is a more important aim than punishment. (Sept. 30, 2018, Gov. ltr to Senate.) "There is a fundamental principle at stake here: whether we want a society which at least attempts to reform the youngest offenders before consigning them to adult prisons where their likelihood of becoming a lifelong criminal is so much higher. [¶] My view is that we should continue to work toward a more just system that respects victims, protects public safety, holds youth accountable, and also seeks a path of redemption and reformation wherever possible." (*Ibid.*)

At a hearing in October 2018, B.M.'s counsel, the Riverside County Public Defender, moved to dismiss the pending transfer motion under SB 1391. The district attorney opposed, arguing the new law is an invalid legislative amendment because it conflicts with Proposition 57's intent to authorize judges to transfer 14 to 17 year olds to criminal court. After supplemental briefing and a bifurcated hearing on the issue, the juvenile court agreed with the district attorney and ruled SB 1391 is invalid. The court concluded Proposition 57's intent "is explicit in its own language when it says that 14- and 15-year-olds can be prosecuted for murder in the adult court upon motion of the People and granting of that motion by the courts." It further concluded SB 1391 conflicted with that intent by eliminating prosecutors' ability to file transfer motions for those juveniles. The court found the Legislature's declaration that SB 1391 is consistent

4

with Proposition 57's intent "conclusory," and found the Governor's signing statement "equally unpersuasive."

## II

## ANALYSIS

A. *Standard of Review*

We review the juvenile court's interpretation of Proposition 57 and SB 1391 de novo. (*People v. Health Laboratories of North America, Inc.* (2001) 87 Cal.App.4th 442, 445 ["The interpretation of a statute and the determination of its constitutionality are questions of law"].) Where voter initiatives like Proposition 57 are concerned, the California Constitution limits the power of the Legislature to "undo[] what the people have done" (*Proposition 103 Enforcement Project v. Quackenbush* (1998) 64 Cal.App.4th 1473, 1484) by requiring voter approval of any law amending or repealing an initiative, unless the initiative itself allows legislative amendment. (Cal. Const., art. II, § 10, subd. (c).) Proposition 57 contains such an allowance, permitting legislative amendments that are "consistent with and further [its] intent." (Ballot Pamp., *supra*, text of Prop. 57, § 5 at p. 145; see *Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1251 (*Amwest*) ["It is common for an initiative measure to include a provision authorizing the Legislature to amend the initiative without voter approval only if the amendment furthers the purpose of the initiative"].) As our Supreme Court explained in *Amwest*, "[s]uch a limitation upon the power of the Legislature must be strictly construed,

5

but it also must be given the effect the voters intended it to have." (*Amwest*, *supra*, 11 Cal.4th at pp. 1255-1256.)

Thus, when determining whether a legislative amendment furthers an initiative's intent, we must apply "a strong presumption of constitutionality [to the] Legislature's acts" and uphold the amendment "if, *by any reasonable construction*, it can be said that the statute furthers the purposes" of the initiative. (*Amwest*, *supra*, 11 Cal.4th at pp. 1253, 1256, italics added.) We also bear in mind the well-established separation of powers principle that "[c]ourts should exercise judicial restraint in passing upon the acts of coordinate branches of government; the presumption is in favor of constitutionality, and the invalidity of the legislation must be clear before it can be declared unconstitutional." (*Dittus v. Cranston* (1959) 53 Cal.2d 284, 286.) Legislative findings are entitled to "great weight" and "will be upheld unless they are found to be unreasonable and arbitrary." (*Amwest*, at p. 1252.) This is especially true where the Legislature has directly considered the constitutional issue and found the amendment consistent with the voter initiative, as it has here. "'Although the ultimate constitutional interpretation must rest, of course, with the judiciary (see *Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137, 176-180 [2 L.Ed. 60]), a focused legislative judgment on the question enjoys significant weight and deference by the courts.'" (*Property Reserve, Inc. v. Superior Court* (2016) 1 Cal.5th 151, 193.)

6

B.    *Historical Background*

Proposition 57 was not approved in a vacuum.  To understand its purpose, it's helpful to place the initiative in historical context.  (See *Amwest*, *supra*, 11 Cal.4th at p. 1257 [reviewing history of insurance rate regulation "[i]n order to determine the purposes of Proposition 103"].)

1.    *Differences between the juvenile and criminal justice systems*

Whether a minor remains in the juvenile justice system or is tried as an adult in criminal court "has potentially major consequences."  (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 306 (*Lara*).)  While a minor "convicted of serious crimes in adult court can be punished by a long prison sentence, juveniles are generally treated quite differently, with rehabilitation as the goal."  (*Ibid.*)

"A 'juvenile court' is a separate, civil division of the superior court.  (§ 246.)  A prosecutor charges a minor with an offense by filing a juvenile petition, rather than a criminal complaint.  (See §§ 653.7, 655.)  Minors 'admit' or 'deny' an offense, rather than plead 'guilty' or 'not guilty.'  (§ 702.3.)  There are no 'trials,' per se, in juvenile court, rather there is a 'jurisdictional hearing' presided over by a juvenile court judge.  (§ 602.)  The jurisdictional hearing is equivalent to a 'bench trial' in a criminal court.  (See Cal. Rules of Court, rule 5.780.)  Although a juvenile court judge adjudicates alleged law violations, there are no 'conviction[s]' in juvenile court.  (§ 203.)  Rather, the juvenile court determines—under the familiar beyond [a] reasonable doubt standard and under the ordinary rules of evidence—whether the allegations are 'true' and if the minor

7

comes within its jurisdiction.  (See § 602 et seq.)"  (*People v. Vela* (2017) 11 Cal.App.5th 68, 73-74 (*Vela*).)

"There is no 'sentence,' per se, in juvenile court.  Rather, a judge can impose a wide variety of rehabilitation alternatives after conducting a 'dispositional hearing,' which is equivalent to a sentencing hearing in a criminal court.  (§ 725.5; *In re Devin J.* (1984) 155 Cal.App.3d 1096, 1100.)  In the more serious cases, a juvenile court can 'commit' a minor to juvenile hall or to the Division of Juvenile Justice (DJJ), formerly known as the California Youth Authority (CYA).  In order to commit a minor to the DJJ, the record must show that less restrictive alternatives would be ineffective or inappropriate.  (*In re Teofilio A.* (1989) 210 Cal.App.3d 571, 576.)  The DJJ, rather than the court, sets a parole consideration date.  DJJ commitments can range from one year or less for nonserious offenses, and up to seven years for the most serious offenses, including murder.  (See Cal. Code Regs, tit. 15, §§ 4951-4957.)  A minor committed to DJJ must generally be discharged no later than 23 years of age.  (§ 607, subd. (f).)" (*Vela*, *supra*, 11 Cal.App.5th at pp. 73-74.)

These "'[s]ignificant differences between the juvenile and adult offender laws underscore their different goals:  The former seeks to rehabilitate, while the latter seeks to punish.'"  (*Vela*, *supra*, 11 Cal.App.5th at p. 73.)  The Welfare and Institutions Code defines the dual goals of the juvenile justice system as (i) "to provide comprehensive education, training, treatment, and rehabilitative services to youthful offenders under the jurisdiction of the department, that are designed to promote community restoration,

8

family ties, and accountability to victims" and (ii) "to produce youth who become law-abiding and productive members of society."  (§ 1710, subd. (b)(2).)

        2.     *California's prosecution of minors*

Because our juvenile justice system was "created to deal with [young offenders] in an essentially nonpenal manner, for the protection and benefit of the minor" (*People v. Lara* (1967) 67 Cal.2d 365, 380), it may come as no surprise that for much of our state's history we have shielded all but our oldest minors from criminal court.  Initially, "[t]he general rule used to be . . . a child [under 18] could be tried in criminal court only after *a judicial determination* . . . he or she was unfit to be dealt with under juvenile court law."[2] (*Lara*, *supra*, 4 Cal.5th at p. 305, italics added.)  However, in 1961, with the enactment of the "Juvenile Court Law," the Legislature set the minimum age at which a minor could be transferred to criminal court at 16 years.  (Stats. 1961, ch. 1616, § 2, p. 3485.)  The law was "hailed as a model for other states to follow."  (Boches, *Juvenile Justice in California:  A Re-Evaluation* (1967) 19 Hastings L.J. 47, 1 ["California can take just pride in having initiated the trend towards procedural protection of the rights of juveniles . . . Such basic concepts as detention hearings, right to counsel, appointment of counsel

---

     **2** The predecessor to Welfare and Institutions Code section 707, the provision governing fitness determinations, was enacted by the Legislature in 1915.  That statute gave the court authority to determine any minor alleged to have violated the law "is not a fit and proper subject to be dealt with under the [juvenile laws] . . . [and to] dismiss the petition therein, and direct that said person be prosecuted under the general law."  (Stats. 1915, ch. 631, § 4c, p. 1228.)

for indigents, mandatory records of proceedings, and the sealing of records were spearheaded by California"], fns. omitted.)

In 1975, the Legislature established the relevant criteria for the fitness or transfer determination, which remain essentially the same today. Specifically, the juvenile court must determine whether the minor is "amenable to the care, treatment, and training program available through the facilities of the juvenile court" based on: (1) the minor's criminal sophistication, (2) whether they can be rehabilitated before the juvenile court will lose jurisdiction, (3) their previous delinquent history, (4) the success of prior attempts to rehabilitate the minor, and (5) the circumstances and gravity of the alleged offense. (Welf. & Inst. Code, § 707, subd. (c); cf. Stats. 1975, ch. 1266, § 4.)

The minimum transfer age remained at 16 for over three decades, until 1994, when the Legislature lowered it to 14. (Stats. 1994, ch. 453, § 9.5, former Welf. & Inst. Code, § 707, subd. (d).) Under that 1994 provision, minors who committed one of several enumerated serious or violent felonies (including murder, robbery, and forcible rape) when they were 14 or 15 could be found unfit by the juvenile court and transferred to criminal court. (*Id.* at former § 707, subd. (d)(2).)

The biggest shift in our prosecution of youth offenders, however, occurred in 1999 and 2000, when changes to the Welfare and Institutions Code gave prosecutors authority to directly file charges against minors in criminal court *without a judicial determination of unfitness*. (*Lara*, *supra*, 4 Cal.5th at p. 305 [under the 1999 & 2000 amendments "prosecutors were permitted, and sometimes required, to file charges against a juvenile

directly in criminal court, where the juvenile would be treated as an adult"].) The most significant of these changes was Proposition 21, which California voters passed in 2000, based primarily on concerns about gang violence. (Ballot Pamp., Primary Elec. (March 2000) text of Prop. 21, § 2.)

"'Proposition 21 revised the juvenile court law to *broaden the circumstances* in which minors 14 years of age and older can be prosecuted in the criminal division of the superior court, rather than in juvenile court. [It] authorize[d] specified charges against certain minors to be filed directly in a court of criminal jurisdiction, without a judicial determination of unfitness under the juvenile court law.'" (*Vela*, *supra*, 11 Cal.App.5th at p. 74, quoting *Manduley v. Superior Court* (2002) 27 Cal.4th 537, 549, 574.) Proposition 21 required district attorneys to file charges directly in criminal court (mandatory direct filing) against any minor alleged to have committed either special circumstances murder (Pen. Code, § 190.2) or a One Strike sex offense (Pen. Code, § 667.61) when they were 14 or older. (Former Welf. & Inst. Code, § 602, subd. (b), repealed by Initiative Measure (Prop 57, § 4.1, approved Nov. 8, 2016, eff. Nov. 9, 2016).) For other serious offenses and circumstances, Proposition 57 gave district attorneys discretion to charge minors age 14 to 17 in criminal court. (Former Welf. & Inst. Code, § 707, subd. (d), repealed by Initiative Measure (Prop 57, § 4.2, approved Nov. 8, 2016, eff. Nov. 9, 2016).)

Less than two decades later, the electorate passed Proposition 57 and repealed the practice of mandatory and discretionary direct filing, essentially "return[ing] California to

11

[its] historical rule," where no minor could be tried in criminal court without "a judicial determination . . . he or she was unfit to be dealt with under juvenile court law." (*Lara*, 4 Cal.5th at p. 305.) Under Proposition 57, district attorneys could request to transfer only two categories of minors—(i) 16 and 17 year olds alleged to have committed a felony and (ii) 14 and 15 year olds alleged to have committed a specified serious or violent felony.[3] (Former Welf. & Inst. Code, § 707, subd. (b), Prop. 57, § 4.2.) Such minors could be tried as adults "only after a juvenile court judge conducts a transfer hearing to consider various factors such as the minor's maturity, degree of criminal sophistication, prior delinquent history, and whether the minor can be rehabilitated." (*Lara*, *supra*, 4 Cal.5th at p. 305; see Welf. & Inst. Code, § 707, subd (a)(1) [listing transfer factors].)

The voters approved Proposition 57 in the midst of a "sea change in penology regarding the relative culpability and rehabilitation possibilities for juvenile offenders." (*Vela*, *supra*, 11 Cal.App.5th at p. 75.) The change is most notably reflected in a series of United States Supreme Court opinions issued in the 16 years between California's approval of Propositions 21 and 57. Recognizing the significant differences between children and adults, the opinions place constitutional limits on punishments for minors "even when they commit terrible crimes." (*Miller v. Alabama* (2012) 567 U.S. 460, 472 (*Miller*) [holding unconstitutional mandatory life sentences without parole (LWOP) for minors, even for homicide offenses, and requiring consideration of youth-related factors

---

[3] The list of felonies includes murder, attempted murder, robbery, carjacking, assault with a firearm, and various sex offenses. (§ 707, subd. (b).)

at sentencing]; see also, e.g., *Graham v. Florida* (2010) 560 U.S. 48, 67 [holding unconstitutional LWOP sentences for minors convicted of nonhomicide offenses]; *Montgomery v. Louisiana* (2016) 136 S.Ct. 718 [holding *Miller's* prohibition on mandatory LWOP for minors constitutes a new substantive constitutional rule that is retroactive on state collateral review].)

The U.S. Supreme Court based those decisions on the "common sense" differences between children and adults, as well as recent scientific research on adolescent brain development. (*Miller*, *supra*, 567 U.S. at p. 471.) In *Miller*, the Court identified "three significant gaps between juveniles and adults" that show "juveniles have diminished culpability and greater prospects for reform," and are therefore "'less deserving of the most severe punishments.'" (*Ibid*.) First, juveniles "'"lack [] maturity'"" and have "'"an underdeveloped sense of responsibility,'"" which leads to "recklessness, impulsivity, and heedless risk-taking." (*Ibid.*) Second, they "'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings." (*Ibid.*) And third, "'a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].'" (*Ibid.*) These traits "lessen[] a child's 'moral culpability' and enhance[] the prospect that, as the years go by and neurological development occurs, his "'deficiencies will be reformed.""" (*Id.* at p. 472.)

13

The Governor signed SB 1391 into law on September 30, 2018 and it went into effect on January 1, 2019. As noted, SB 1391 eliminated district attorneys' ability to request transfer hearing for 14 and 15 year olds, thereby returning California's minimum transfer age to 16.

C.      *SB 1391 Furthers Proposition 57's Purposes*

Having reviewed the relevant historical background, we turn to identifying Proposition 57's purposes and determining whether SB 1391 advances them, under any reasonable construction. (*Amwest*, *supra*, 11 Cal.4th at p. 1256.) "In order to determine the intent of Proposition 57, we not only look to its provisions, but we may also look to the ballot materials in support of its passage." (*Vela*, *supra*, 11 Cal.App.5th at p. 75.) As the Court explained in *Amwest*, when determining whether a legislative amendment is consistent with the purpose of a voter initiative, a court is not "limited to the express statement of purpose included in the initiative." (*Amwest*, at p. 1256.) "To the contrary, . . . 'evidence of its purpose may be drawn from many sources, including the historical context of the amendment, and the ballot arguments favoring the measure.'" (*Ibid.*)

Proposition 57 contains a "purpose and intent" section that identifies five express goals.[4] That section says, "[i]n enacting this act, it is the purpose and intent of the people

---

[4] Our dissenting colleague faults us for looking at these express goals, as well as the information in Proposition 57's ballot pamphlet. Instead, our colleague would go no further than the text of Proposition 57's transfer hearing provision, which he concludes unambiguously demonstrates a single intent—to authorize juvenile courts to make the transfer decisions concerning 14 to 17 year olds. In our view, the dissent's analysis is too narrow and, more importantly, ignores *Amwest*. That case makes clear that our task is not to discern the intent of Proposition 57's transfer hearing *provision*. Rather, we must

*[footnote continued on next page]*

14

of the State of California to: [¶]1. Protect and enhance public safety. [¶]2. Save money by reducing wasteful spending on prisons. [¶]3. Prevent federal courts from indiscriminately releasing prisoners. [¶]4. Stop the revolving door of crime by emphasizing rehabilitation, especially for juveniles. [¶]5. Require a judge, not a prosecutor, to decide whether juveniles should be tried in adult court." (Ballot Pamp., *supra*, text of Prop. 57, § 2 at p. 141.) In addition to these stated goals, we may also consider the initiative's ballot materials and historical context to determine its "major purposes." (*Amwest*, *supra*, 11 Cal.4th at pp. 1256, 1259; *Vela*, *supra*, 11 Cal.App.5th at p. 75 ["In order to determine the intent of Proposition 57, we not only look to its provisions, but we may also look to the ballot materials in support of its passage"].)

We start with the most obvious goal of Proposition 57's juvenile offender provisions—stopping "the revolving door of crime by emphasizing rehabilitation." (Ballot Pamp., *supra*, text of Prop. 57, § 2 at p. 141.) Proposition 57 furthers this aim by repealing the practice of prosecutorial direct filing, thereby "broaden[ing] the number of minors who could potentially stay within the juvenile justice system, *with its primary emphasis on rehabilitation rather than punishment*." (*Vela*, *supra*, 11 Cal.App.5th at

*[footnote continued from previous page]*
*[footnote continued from previous page]*
discern the intent behind Proposition 57 *as a whole* and decide whether SB 1391 furthers that overarching intent under "any reasonable construction," all the while applying a "strong presumption of constitutionality [to the] Legislature's acts." (*Amwest*, *supra*, 11 Cal.4th at pp. 1253, 1256.) There are other reasons we disagree with the dissent's analysis, but its failure to apply *Amwest* is the most significant. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455-456 [California Supreme Court precedent is binding on California appellate courts].)

p. 76 [interpreting the purpose behind Proposition 57's juvenile offender provisions], italics added.)  The argument in favor of Proposition 57 in the voter information guide pointed out, "the more inmates are rehabilitated, the less likely they are to re-offend . . . [and] minors who remain under juvenile court supervision are less likely to commit new crimes."  (Ballot Pamp., argument in favor of Prop. 57 at p. 58.)  Our Supreme Court described Proposition 57's juvenile offender provisions as an "ameliorative change[] to the criminal law" because they increased the chances more juveniles would receive "the potential 'ameliorating benefits' of rehabilitation (rather than punishment)."  (*Lara*, *supra*, 4 Cal.5th at p. 309.)

SB 1391 goes a step beyond Proposition 57 and shields an *entire class* of minors from criminal court.  As the Assembly Committee on Public Safety concluded when it analyzed the legislative amendment, "Keeping 14 and 15 year olds in the juvenile justice system will help to ensure that youth receive treatment, counseling, and education they need to develop into healthy, law abiding adults."  (Assem. Com. on Public Safety, Rep. on SB 1391 (2017-2018 Reg. Sess.) as amended May 25, 2018, p. 4.)  "The juvenile justice system is very different from the adult system. The juvenile system provides age-appropriate treatment, services, counseling, and education, and a youth's participation in these programs is mandatory.  The adult system has no age-appropriate services, participation in rehabilitation programs is voluntary, and in many prisons, programs are oversubscribed with long waiting lists."  (Sen. Com. on Public Safety, Rep. on SB 1391 (2017-2018 Reg. Sess.) Feb. 16, 2018, p. 3.)  Because SB 1391 definitely, not just

16

potentially, increases the number of juveniles who will remain in the juvenile justice system and receive rehabilitation-focused services as a consequence of their offenses, it necessarily follows that the legislative amendment furthers Proposition 57's aim of youth rehabilitation.

When it comes to the initiative's goal of reducing prison spending, the voters recognized that the more children who remain in the juvenile justice system, the less money California will spend on "state prison and parole costs as . . . youths would no longer spend any time in prison or be supervised by state parole agents following their release." (Ballot Pamp., *supra*, analysis by the legislative analyst at p. 57.) Proposition 57 has the potential to reduce prison spending because it makes it more difficult for prosecutors to try children in criminal court. Again, because SB 1391 will necessarily result in fewer juveniles being transferred to the criminal justice system, it will result in a reduction of prison spending, and therefore advances this intent as well.

SB 1391 also furthers Proposition 57's goal of enhancing public safety. In 2007, the Centers for Disease Control and Prevention published a study by an independent task force that had reviewed the scientific evidence regarding juvenile transfers to the criminal justice system. The task force concluded that placing minors in the adult criminal justice system "typically increases rather than decreases rates of violence among transferred youth" and, based on that conclusion, recommended against laws "facilitating the transfer of juveniles to the adult criminal justice system." (Hahn et. al., Effects on Violence of Laws and Policies Facilitating the Transfer of Youth from the Juvenile to the Adult

17

Justice System:  A Report on Recommendations of the Task Force on Community Preventive Services, Cal. Dept. of Health and Human Services., Centers for Disease Control and Prevention (Nov. 2007) pp. 1, 6-9.)  In 2009, the federal district courts for the Eastern and Northern Districts of California concluded our state's overcrowded prisons had become "criminogenic," meaning they contribute to, not minimize, the occurrence of crime.  (*Coleman v. Schwarzenegger* (E.D.Cal. & N.D.Cal. 2009) 922 F.Supp.2d 882, 973 (*Coleman*).)  Proposition 57's proponents made a similar argument, pointing out that keeping minors in the juvenile system protects and enhances public safety, because those "who remain under juvenile court supervision are less likely to commit new crimes."  (Ballot Pamp., *supra*, argument in favor of Prop. 57 at p. 58.)

The Assembly Committee on Public Safety echoed this conclusion in its report on SB 1391.  "When youth are given [the] age-appropriate services and education that are available in the juvenile justice system, they are less likely to recidivate."  (Assem. Com. on Public Safety, Rep. on SB 1391, *supra*, at p. 4.)  "Most youth will eventually be released from prison and in the interest of protecting public safety, we need to ensure they get the treatment and tools they need to succeed when they return to society."  (Sen. Com. on Public Safety, Rep. on SB 1391, *supra*, at p. 4.)  SB 1391's author added that the practice of transferring 14 and 15 year olds to criminal court "was started in the 90's, a time in California history where the state was getting 'tough on crime,' but not smart on crime.  Back then, society believed that young people were fully developed at around age 14.  Now, research has debunked that myth and cognitive science has proven that

18

children and youth who commit crimes are very capable of change." (Assem. Com. on Public Safety, Rep. on SB 1391, at p. 3.)

SB 1391 can easily be construed to promote public safety and reduce crime, since it increases the number of youth offenders who will remain in the juvenile justice system and avoid prison where the chance of recidivism is higher. What's more, SB 1391 leaves intact prosecutors' ability to petition the juvenile court to extend its jurisdiction if discharging a juvenile offender "would be physically dangerous to the public because of the person's mental or physical deficiency, disorder, or abnormality that causes the person to have serious difficulty controlling his or her dangerous behavior." (§ 1800, subd. (a).) This provision recognizes that not every juvenile offender will be successfully rehabilitated and creates a safety valve for circumstances where an offender remains dangerous.

Next, we consider Proposition 57's goal of limiting prosecutorial charging discretion by having "a judge, not a prosecutor" making transfer determinations. (Ballot Pamp., *supra*, text of Prop. 57, § 2 at p. 141.) The legislative analyst described the initiative's procedural safeguard against prosecutorial discretion: "the only way a youth could be tried in adult court is if the juvenile court judge in the hearing decides to transfer the youth to adult court . . . [N]o youth could be tried in adult court based only on the decision of a prosecutor." (Ballot Pamp., analysis by the legislative analyst at p. 56.) SB 1391 maintains the transfer hearing requirement and places a further limit on prosecutorial discretion—it prohibits district attorneys from even requesting to transfer

19

14 and 15 year olds to criminal court. Both laws evince a re-evaluation of the tough-on-crime philosophy underlying Proposition 21 and a desire to return California's treatment of youth offenders to where it had been before that initiative. Proposition 57 repealed the practice of direct filing and re-established the former rule that all minors are entitled to a judicial determination of unfitness before they can be transferred to criminal court. SB 1391 continues in the same direction of youth justice reform, resetting the minimum transfer age to 16, where it had been for decades before Proposition 21.

Finally, SB 1391 advances Proposition 57's goal of reducing prison overcrowding, in response to a 2009 federal court order under the Prison Litigation Reform Act (PLRA). (*Coleman*, *supra*, 922 F.Supp.2d at p. 962; see Ballot Pamp., *supra*, text of Prop. 57 at p. 141 [identifying a purpose of "prevent[ing] federal courts from indiscriminately releasing prisoners"].) In *Coleman*, two federal district courts concluded that decades of "[t]ough-on-crime politics have increased the population of California's prisons dramatically while making necessary reforms impossible," turning our prisons into "places 'of extreme peril to the safety of persons' they house." (*Coleman*, at p. 887.) Recognizing that population reduction orders are a remedy of "last resort" under the PLRA, the district courts found the remedy necessary because the overcrowding in our prisons had reached a "breaking point." (*Id.* at pp. 950, 1003.) The courts ordered California to "reduce the prisoner population to 137.5% of [each prison's] total design capacity" and retained jurisdiction to ensure compliance with the order. (*Id.* at pp. 962, 964.) The courts concluded that our compliance with the order would, among other

20

benefits, enhance public safety "by reducing the criminogenic aspects of [our] prisons." (*Id.* at p. 971.) In approving Proposition 57, the voters recognized that a check on prosecutorial charging discretion could, in addition to the other benefits just discussed, also help California comply with the PLRA and population reduction order. SB 1391 provides additional aid in this endeavor by keeping an entire category of offenders out of prison.

These are Proposition 57's five express goals, and SB 1391 plainly advances all of them. (See Chemerinsky, *Prosecutors' attack on youth justice reform undermines democracy*, The Sacramento Bee (Feb. 10, 2019) <https://www.sacbee.com/opinion/california-forum/article225921805.html> [observing the "obvious synergy" between the two laws—"a law that keeps children out of adult court furthers [Proposition 57's] twin goals of reducing prison spending and giving youth more opportunity for rehabilitation"].) Despite this clear consistency, respondent, the Riverside County District Attorney, and our dissenting colleague would strike SB 1391 down because it eliminates prosecutors' ability to request transfers of 14 and 15 year olds. Respondent interpreted Proposition 57's intent as allowing "14- and 15-year-olds [to] be prosecuted for [serious crimes] in the adult court upon motion of the People and granting of that motion by the courts." As the District Attorney articulates the same argument, SB 1391 is necessarily inconsistent with Proposition 57 because it "*took out* the very ability to prosecute 14 and 15-year old minors that [Proposition 57] *put into* the . . . Welfare and Institutions Code." In fact, the transfer hearing requirement is not

something Proposition 57 added to the Welfare and Institutions Code. Transfer hearings were the norm until Proposition 21. Proposition 57 simply returned California to its historical practice of making them a prerequisite to all transfers.

In interpreting Proposition 57's overarching purpose as confined to its transfer hearing provision, respondent, the District Attorney, and our dissenting colleague take an initiative clearly intended to limit prosecutorial power, increase rehabilitative opportunities for youth, and reduce prison spending, and recharacterize it as a law concerned with *effectuating* the transfer of juveniles to criminal court. We disagree with that characterization. Proposition 57's plain language and historical context reveal the juvenile offender provisions are intended to effect rehabilitation-based reform. Our conclusion finds support in the California Supreme Court's observation that "'by its approval of Proposition 57, . . . the electorate has "expressly determined" that the former system of direct filing was "too severe."'" (*Lara*, *supra*, 4 Cal.5th at p. 309.) The purpose of the juvenile offender provisions is to check prosecutorial discretion and abolish direct filing, not increase the juvenile court's power to transfer minors to criminal court. In other words, the transfer hearing requirement is the mechanism by which Proposition 57 limits prosecutorial charging discretion, it is not the purpose of the juvenile offender provisions.

As the court recently explained in *People v. Superior Court (Alexander C.)* (2019) 34 Cal.App.5th 994 (*Alexander C.*), the view taken by respondent, the District Attorney, and the dissent "presumes, incorrectly, that amendments to the *provisions* of Proposition

22

57 necessarily change the *intent* of Proposition 57." (*Alexander C.*, *supra*, 34 Cal.App.5th at p. 1003.) "Any amendment changes an initiative's '""scope or effect . . ., whether by addition, omission, or substitution of provisions.""' [Citation.] But if any amendment to the provisions of an initiative is considered inconsistent with an initiative's intent or purpose, then an initiative such as Proposition 57 could never be amended. There would be no purpose to having included, as Proposition 57 does, language expressly allowing legislative amendments that 'are consistent with and further the intent' of the proposition. [Citation.] The District Attorney's mistake here is to have defined the intent of the electorate in adopting Proposition 57 at a level so granular as to equate that intent with each of the specific provisions in the initiative."[5] (*Ibid.*)

Next, the District Attorney argues that if we uphold SB 1391, nothing will prevent the Legislature from *eliminating all juvenile transfers* in the future. Proposition 57 and SB 1391 are reforms intended to undo Proposition 21's more severe juvenile offender provisions. To accomplish that goal, SB 1391 goes no further than returning the minimum transfer age to where it was before 1994. Certainly, if the Legislature ever eliminated transfers for 16 and 17 year olds, that change would bring us into new territory. But it is not our job to opine on the validity of hypothetical laws, and we

---

[5] The District Attorney finds it "curious and surprising" the *Alexander C.* opinion did not address *Gardner v. Schwarzenegger* (2009) 178 Cal.App.4th 1366 and *Foundation for Taxpayer & Consumer Rights v. Garamendi* (2005) 132 Cal.App.4th 1354, cases he argues are dispositive because they hold that legislative amendments must further *every* purpose of an initiative, and amendments that further only one of multiple purposes. Given that our colleagues concluded SB 1391 furthered all of Proposition 57's purposes, they, like us, would have no occasion to address those cases.

23

decline to decide now whether any future amendment to Proposition 57 would be consistent with its purposes.

The District Attorney also argues the Court's conclusion about the legislative amendment in *Amwest* requires us to strike down SB 1391, but we find that case factually distinguishable. The initiative at issue there (Proposition 103) was a consumer-friendly reform designed to transform California's free-market approach to insurance rates to a regulated approach. In that vein, Proposition 103 imposed two new requirements on insurance companies—all insurance rates must (i) be approved by the insurance commissioner and (ii) undergo a 20 percent reduction. (*Amwest*, *supra*, 11 Cal.4th at p. 1259.) Two years later, the Legislature enacted a law that exempted surety insurance from those two requirements. After reviewing the history of insurance regulation in California, as well as Proposition 103's stated purposes and codified provisions, the Court concluded the legislative amendment was inconsistent with Proposition 103's "major purposes" because it exempted surety insurance from the very regulatory system the initiative established. (*Amwest,* at pp. 1258-1259.)

SB 1391 is the mirror image of the amendment in *Amwest*. Where that amendment returned a category of insurance to the unregulated, free-market system Proposition 103 had repealed, SB 1391 does the reverse. It takes Proposition 57's protections for youth offenders one step further, by shielding a class of minors from the criminal justice system. To be analogous to *Amwest*, SB 1391 would have to subject the class of minors to the prosecutorial direct filing practices that Proposition 57 repealed.

24

Finally, we reject the District Attorney's contention that SB 1391 is invalid because it unconstitutionally amends Proposition 21, which, unlike Proposition 57, does not have an allowance provision for amendments consistent with its purpose. "Upon the passage of Proposition 57, the only provisions in section 707 relating to adult prosecution of minors under the age of 16 were those added by that voter enactment. All remnants of Proposition 21 were deleted by passage of Proposition 57. (Compare Voter Information Guide, Gen. Elec. (Nov. 8, 2016) text of Prop. 57, § 4.2, pp. 144-145 (2016 Voter Guide) [striking in their entirety former subds. (c) and (d) of § 707] with Voter Information Guide, Primary Elec. (Mar. 7, 2000) text of Prop. 21, § 26, pp. 127-129 [amending former subd. (c) and adding former subd. (d) of § 707 thereby permitting direct adult prosecution of 14- and 15-year-old minors]; see also *J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 710-711, 233 Cal.Rptr.3d 220 [construing Proposition 57 as a rejection of Proposition 21].)" (*People v. Superior Court (K.L.)* (2019) 36 Cal.App.5th 529, 534, fn. 3.)

The District Attorney has not persuaded us that the voters approved Proposition 57 to create a mechanism to transfer 14 and 15 year olds to criminal court. We take seriously our duty to """"jealously guard""""" the electorate's initiative power (*People v. Kelly* (2010) 47 Cal.4th 1008, 1025), but to construe the amendment allowance in Proposition 57 as respondent and the District Attorney do, would be no allowance at all. To the contrary, it would unnecessarily and unwisely constrain our lawmakers, prohibiting them from making well-researched and informed policy decisions based on

new scientific research and our changing understanding of criminology and penology. In other words, it would freeze any effort at youth justice reform in the name of preserving the integrity of an initiative promoting youth justice reform.

We have no trouble concluding the voters did not intend such stagnation when they approved Proposition 57. Given the initiative's stated goals and historical context, we think SB 1391 is precisely the type of rehabilitation-based legislation the voters had in mind when they allowed for future amendments.

### III

### DISPOSITION

Let a peremptory writ of mandate issue directing the respondent juvenile court to (1) vacate its order declaring S.B. 1391 invalid and (2) deny the motion to transfer B.M. to criminal court. The stay we ordered on March 7, 2019 shall expire upon finality of this opinion as to this court.

CERTIFIED FOR PUBLICATION

SLOUGH

J.

I concur:

CODRINGTON

J.

26

[*B.M. v. Superior Court* (*People*), E072265]

McKINSTER, Acting P.J.

I respectfully dissent.  Three years ago, the voters of the State of California resoundingly approved the Public Safety and Rehabilitation Act of 2016, more commonly known as Proposition 57 (Prop. 57).[1]  Among other things, Prop. 57 amended the Welfare and Institutions Code so that prosecutors could no longer file criminal charges against certain 14- and 15-year-old juvenile offenders directly in adult criminal court.  Instead, Prop. 57 requires prosecutors to file a wardship petition in the juvenile court, then request that the court conduct a "fitness" hearing to determine whether the minor should stay in juvenile court or be transferred to adult court for criminal prosecution.  The change enacted by Prop. 57 was modest and maintained in place much of the status quo ante: 14- and 15-year-old juvenile offenders who commit serious felony offenses, and who are not likely to benefit from rehabilitation and treatment in the juvenile justice system, are still eligible for transfer to adult criminal court for prosecution.  The voters left open the possibility that the Legislature could amend the changes they made to the juvenile justice system with Prop. 57, but only if the legislative amendment was consistent with and furthered the intent of the voters.

---

[1] The final statewide vote tally for Prop. 57 was 8,790,723 for, and 4,847,354 against.  (Cal. Sect. of State, Supp. to Statement of Vote (2016) p. 108, at <https://elections.cdn.sos.ca.gov/sov/2016-general/ssov/ssov-complete.pdf> [as of Oct. 1, 2019].)

1

Two years later, the Legislature passed, and the Governor signed into law, Senate Bill No. 1391 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1012, § 1). That statute once again amended the portion of the Welfare and Institutions Code that deals with the transfer of juvenile offenders to adult criminal court. But, whereas Prop. 57 left in place the ability of the juvenile court to transfer certain 14- and 15-year-old juvenile offenders, Senate Bill No. 1391 all but eliminated the prosecutor's ability to even request such a transfer except for in the extraordinarily rare situation that the minor remains at large and is not apprehended until after the juvenile court loses jurisdiction.

The question raised by this original proceeding is simple: Is Senate Bill No. 1391 consistent with Prop. 57 and does it further the intent of the voters who enacted the initiative? The juvenile court below answered that question "no," and found Senate Bill No. 1391 to be unconstitutional in a case where the prosecutor moved to transfer to adult criminal court a minor who was alleged to have committed special circumstance murder by arson when she was a mere nine days short of her 16th birthday. The majority reaches the opposite conclusion and grants the minor's petition for a writ of mandate directing the juvenile court to find Senate Bill No. 1391 to be constitutional and effective.

I disagree with the majority's interpretation of Prop. 57 and its conclusions about the intent of the voters who enacted it. Because I conclude Senate Bill No. 1391 is not consistent with Prop. 57 and does not further the modest goals of the voters vis-à-vis juvenile justice, I would deny the minor's petition. Therefore, I must respectfully dissent.

2

I.

In an April 6, 2018 petition filed in the juvenile court pursuant to Welfare and Institutions Code section 602, the district attorney alleged petitioner B.M. willfully murdered her mother when the minor was nine days shy of her 16th birthday. (Pen. Code, § 187.) The petition also alleged the special circumstance that the murder was committed during the commission of an arson. (Pen. Code, §§ 190.2, subd. (a)(17)(H), 451, subd. (b).) Because of B.M.'s age and the seriousness of the offense she was accused of committing, the prosecutor moved the juvenile court to transfer the proceeding to adult criminal court pursuant to Welfare and Institutions Code section 707 (section 707), arguing B.M. was not amenable to treatment as a juvenile.

At the time the prosecutor filed his petition and transfer motion, section 707, as amended by Prop. 57, provided that the prosecutor could move the juvenile court to transfer 14- and 15-year-old juvenile offenders accused of serious felony offenses, including murder and arson, to adult criminal court for prosecution. (Former § 707, subd. (a)(1), as amend. by Prop. 57, Gen. Elec. (Nov. 8, 2016) § 4.2, eff. Nov. 9, 2016; see *id.*, former § 707, subd. (b)(1)-(2).) The juvenile court was then required to decide whether the minor should be transferred to adult criminal court after considering certain criteria, such as the degree of the minor's criminal sophistication, whether the minor was amenable to rehabilitation before the expiration of juvenile court jurisdiction, and the minor's delinquent history, etc. (Former § 707, subd. (a)(2); see *id*, subd. (a)(2)(A)-(E).)

3

While B.M.'s case was pending and before the juvenile court decided the prosecutor's transfer motion, the Legislature passed and the Governor signed into law Senate Bill No. 1391. That law amended section 707 to provide that a prosecutor may now only move the juvenile court to transfer a 14- or 15-year-old juvenile offender to adult criminal court if the minor "was not apprehended prior to the end of juvenile court jurisdiction." (§ 707, subd. (a)(2), as amend. by Stats. 2018, ch. 1012, § 1, eff. Jan. 1, 2019.)

Before Senate Bill No. 1391 went into effect, the prosecutor filed a memorandum of points and authorities in the juvenile court arguing the amendment was ineffective, and the court should grant the transfer motion. Prop. 57 expressly provided that the changes it made to section 707 could "be amended so long as such amendments are consistent with and further the intent of this act by a statute that is passed by a majority vote of the members of each house of the Legislature and signed by the Governor." (Prop. 57, § 5; see Cal. Const., art. II, § 10, subd. (c); *People v. Armogeda* (2015) 233 Cal.App.4th 428, 434 ["'When a statute enacted by the initiative process is involved, the Legislature may amend it only if the voters specifically gave the Legislature that power, and then only upon whatever conditions the voters attached to the Legislature's amendatory powers.'"].)

4

The prosecutor argued Senate Bill No. 1391 is not consistent with and does not further the intent of the voters, as expressed in Prop. 57.[2]

In her opposition to the transfer motion, B.M., as represented by the public defender, argued Senate Bill No. 1391 is consistent with and furthers the aims of Prop. 57 and, therefore, the amendment is effective and prohibits the prosecutor from moving to transfer her to adult criminal court.

After hearing arguments from the parties, the juvenile court concluded Senate Bill No. 1391 is unconstitutional because it conflicts with the express purposes of Prop. 57 as articulated in the plain language of the initiative. The court stayed proceedings in the juvenile court and did not rule on the prosecutor's transfer motion, to permit B.M. to seek review in this court.

B.M. then petitioned this court for a writ of mandate, directing the juvenile court to enter an order concluding Senate Bill No. 1391 is constitutional.

---

[2] In addressing B.M.'s eligibility for transfer under the pre-Senate Bill No. 1391 version of section 707, the prosecutor echoed the probation department's conclusion that B.M. is not an appropriate candidate for treatment as a juvenile. The prosecutor's statement of facts, taken from the probation department's report, indicates the alleged murder by arson "was not the first time [B.M.] caused a fire at her home. Several months prior, [B.M.] started a fire, which was ruled accidental." The fire was started by spraying insect spray too close to an electrical outlet near the room of an "elderly woman" (apparently B.M.'s grandmother) who B.M. and her mother were caring for, and the fire was so severe that the woman had to be rescued, and she received injuries.

## II.

To determine whether Senate Bill No. 1391 is consistent with and furthers the intent of Prop. 57, we must determine what the voters intended when they enacted that initiative. That is a question of statutory interpretation this court examines de novo. (*People v. Prunty* (2015) 62 Cal.4th 59, 71.) "When we interpret an initiative, we apply the same principles governing statutory construction. We first consider the initiative's language, giving the words their ordinary meaning and construing this language in the context of the statute and initiative as a whole. If the language is not ambiguous, we presume the voters intended the meaning apparent from that language, and we may not add to the statute or rewrite it to conform to some assumed intent not apparent from that language. If the language is ambiguous, courts may consider ballot summaries and arguments in determining the voters' intent and understanding of a ballot measure." (*People v. Superior Court* (*Pearson*) (2010) 48 Cal.4th 564, 571.) "In other words, our 'task is simply to interpret and apply the initiative's language so as to effectuate the electorate's intent.'" (*Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 901 (*Robert L.*).)

The majority acknowledges the general rules of statutory interpretation applicable to ballot initiatives. But, the majority then proceeds to discuss the legislative history of Prop. 57 without expressly finding the language is, in fact, ambiguous. (Maj. opn. *ante*, at pp. 14-15.) The relevant portion of Prop. 57 is clear and *unambiguous*. The initiative amended section 707, subdivision (a), to reallocate the decisionmaking authority about

6

whether 14-and 15-year-old juvenile offenders should be tried in adult criminal court from the prosecutor to the juvenile court. Henceforth, prosecutors could no longer directly file criminal charges against minors in adult criminal court. Instead, they were required to file a petition in the juvenile court, then request the juvenile court to conduct a fitness hearing to determine whether the minor should be treated as an adult and transferred to adult criminal court. (Prop. 57, § 4.2.) That is all Prop. 57 did, period.

I perceive no ambiguity in Prop. 57 that justifies delving into the legislative history to discern the voters' intent because that intent is clearly discernable on the face of section 707 as amended by the initiative. And, because Senate Bill No. 1391 purports to amend section 707 to eliminate the prosecutor's ability to request a fitness hearing except in the rarest of cases—something Prop. 57 affirmatively *granted* to prosecutors—I conclude the amendment is not "consistent with" and does not "further the intent" of the voters. (Prop. 57, § 5.) Therefore, it cannot stand. And, even if I were to agree with the majority's implicit conclusion that Prop. 57 is ambiguous, for the reasons stated, *post*, I cannot agree with its conclusion about the voters' intent.

## III.

If the language of a ballot initiative is ambiguous, "we consider extrinsic evidence in determining voter intent, including the Legislative Analyst's analysis and ballot arguments for and against the initiative." (*Silicon Valley Taxpayers' Assn. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 445.)

When it enacted Senate Bill No. 1391, the Legislature expressly found "this act is consistent with and furthers the intent of Proposition 57 . . . ." (Stats. 2018, ch. 1012,

7

§ 3.)  Relying on *Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, the majority says we must give that finding "great weight" and uphold it unless it is unreasonable or arbitrary.  (Maj. opn. *ante*, at p. 6.)  I believe the majority reads too much into *Amwest*.  While discussing "general propositions," the *Amwest* court quoted *California Housing Finance Agency v. Elliot* (1976) 17 Cal.3d 575 at page 583 (*Elliot*), as stating, "'[L]egislative findings, while not binding on the courts, are given great weight and will be upheld unless they are found to be unreasonable and arbitrary.'"  (*Amwest*, at p. 1252.)  *Elliot*, in turn, addressed the "'public purpose' exception to the constitutional prohibition against the gift of public funds" and, in that specific context, stated, "[t]he determination of whether a particular program serves a public purpose is generally vested in the Legislature."  (*Elliot*, at p. 583.)  The situation before this court is very different.  Prop. 57 does not require findings of any kind—it mandates that amendments to the juvenile justice reform it enacted are consistent and further the intent of the voters.  (Prop. 57, § 5.)  Therefore, when interpreting Prop. 57, I would not give the Legislature's gratuitous finding any greater weight than more salient indicia of the *voters*' intent.

In its discussion, the majority provides an overview of the history of the prosecution of juvenile offenders in California, and of more recent legislative and judicial trends at the state and federal level toward keeping juveniles out of adult court.  (Maj. opn. *ante*, at pp. 7-13.)  I assume Prop. 57's drafters were aware of and influenced by that trend.  But, our Supreme Court "has made it clear that the 'motive or purpose of the drafters of a statute is not relevant to its construction, absent reason to conclude that the body which adopted the statute was aware of that purpose and believed the language of

8

the proposal would accomplish it. [Citations.] The opinion of drafters or legislators who sponsor an initiative is not relevant since such opinion does not represent the intent of the electorate and we cannot say with assurance that the voters were aware of the drafters' intent.'" (*Robert L.*, *supra*, 30 Cal.4th at p. 904.) Legislative and judicial antecedents "'not directly presented to the voters . . . are not relevant to our inquiry.'" (*Id*. at pp. 904-905; accord, *Delaney v. Superior Court* (1990) 50 Cal.3d 785, 801 [history of legislation related to initiative constitutional amendment "would not provide us with any guidance as to *the voters*' subsequent intent because none of the indicia of the Legislature's possible intent (committee analysis and digest and letters from the statute's author) were before the voters."].) The ballot pamphlet for Prop. 57 does not address the history and trends discussed by the majority, so we must not assume the intent of the voters was influenced by it.

The relevant explanatory material for Prop. 57 is found on pages 54 to 59 of the official ballot pamphlet for the November 8, 2016 election. (Voter Information Guide, Gen. Elec. (Nov. 8, 2016) pp. 54-59.) The official title and summary prepared by the Attorney General stated, inter alia, Prop. 57 "[p]rovides [that] juvenile court judges shall make [a] determination, upon prosecutor motion, whether juveniles age 14 and older should be prosecuted and sentenced as adults for specified offenses." (*Id*., official title and summary of Prop. 57, p. 54.) The Attorney General also explained that any net savings to the state and net increases in costs to the counties from the various provisions of Prop. 57 would "depend on how certain provisions are implemented." (*Ibid*.)

9

In its analysis of Prop. 57, the Legislative Analyst's Office addressed the background to the initiative. The Analyst explained that, under certain circumstances, minors under the age of 18 could be tried in adult court for criminal offenses and explained how that process worked at the time. (Voter Information Guide, *supra*, analysis of Prop. 57, p. 55.) The Analyst stated that, under the then-existing system, which permitted the prosecutor to directly file charges in adult criminal court against some minors, less than 600 minors were sent directly to adult court annually and less than 100 more were transferred to adult court after a juvenile court conducted a fitness hearing and determined adult prosecution was appropriate. (*Ibid.*)

The Legislative Analyst further explained that Prop. 57 "changes state law to require that, before youths can be transferred to adult court, they must have a hearing in juvenile court to determine whether they should be transferred. As a result, the only way a youth could be tried in adult court is if the juvenile court in the hearing decides to transfer the youth to adult court." (Voter Information Guide, *supra*, analysis of Prop. 57 at p. 56.) "As a result of these provisions," the Analyst concluded, "there would be fewer youths tried in adult court." (*Ibid.*) Addressing the fiscal effects of Prop. 57, however, the Analyst provided a more conservative assessment of the expected savings from the initiative's juvenile justice reform. As the Attorney General did in the official title and summary, the Analyst concluded the net savings to the state would only be realized "[*if*] the measure's transfer hearing requirements result in fewer youths being tried and convicted in adult court," and the concomitant net increases in costs to the counties

10

would only be incurred "[*if*] fewer youths are tried and convicted as adults." (*Id*. at p. 57, italics added.)

Nothing in the official title and summary, or in the official analysis, supports the majority's conclusion that the voters who enacted Prop. 57 intended to effectively eliminate 14- and 15-year-old juvenile offenders from being eligible for trial in adult criminal court. This is borne out in the arguments in favor of and against the adoption of Prop. 57. Reflecting the more modest goals for juvenile justice, the supporters of Prop. 57 stated the initiative "[r]equires judges instead of prosecutors to decide whether minors should be prosecuted as adults emphasizing rehabilitation for minors in the juvenile system." (Voter Information Guide, *supra*, argument in favor of Prop. 57, p. 58.) In addition, the supporters argued "minors who remain under juvenile supervision are less likely to commit new crimes," and "Prop. 57 focuses on evidence-based rehabilitation and allows a juvenile court judge to decide whether or not a minor should be prosecuted as an adult." (*Ibid.*) The rebuttal argument focused entirely on the provisions of Prop. 57 that addressed parole and custody credits for adult offenders. (*Id*., rebuttal to argument in favor of Prop. 57, p. 58.) Likewise, the argument against Prop. 57 and its rebuttal focused entirely on how Prop. 57 addressed adult offenders. (*Id*., argument against Prop. 57 and rebuttal to argument against Prop. 57, p. 59.)

If the voters were being asked to change the juvenile justice system to drastically limit or eliminate the number of 14- and 15-year-old juvenile offenders who could be tried and convicted in adult criminal court, I would expect to see an argument for and

11

against that result. But that dog did not bark.[3] Although "ballot arguments are subject to word limits" and "cannot cover all situations where a measure might apply," "total silence on a subject can indeed be indicative of an absence of intent to affect that subject." (*Citizens Assn.*, *supra*, 209 Cal.App.4th at p. 1197, fn. 19.) As the Supreme Court said in *Penziner v. West American Finance Co.* (1937) 10 Cal.2d 160 about the possible implied repeal of an earlier usury statute by a later constitutional amendment, "It is quite significant that in the argument in support of the amendment sent to all voters (there was no argument *contra*), there is not one word indicating an intent to repeal the usury law. . . . It is quite unlikely that if the [L]egislature in drafting, and the [P]eople in adopting, the constitutional provision had intended it to repeal the usury law, such intent would not have been clearly expressed." (*Penziner*, at p. 178; see *Citizens Assn.*, *supra*, 209 Cal.App.4th at p. 1197, fn. 19.) The fact that neither the supporters nor the opponents of Prop. 57 stated the initiative would effectively eliminate the ability to prosecute 14- and 15-year-old juvenile offenders in adult criminal court is strong evidence that the voters who enacted the initiative *did not intend it have that effect.*

---

[3] "This lack of comment, like Sherlock Holmes's 'dog in the night-time' which tellingly failed to bark (2 Doyle, *Silver Blaze*, in The Annotated Sherlock Holmes (Baring-Gould ed. 1967) pp. 277, 280), was in itself evidence." (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1380; accord, *Citizens Assn. of Sunset Beach v. Orange County Local Agency Formation Com.* (2012) 209 Cal.App.4th 1182, 1191 (*Citizens Assn.*) ["Just as the silence of a dog trained to bark at intruders suggests the absence of intruders, this silence speaks loudly."].)

12

To find such an intent on the part of the voters, the majority relies on Prop. 57's uncodified statement of purpose and intent, found on page 141 of the ballot pamphlet. (Voter Information Guide, *supra*, text of Prop. 57, p. 141; see maj. opn. *ante*, at p. 14.) We are, of course, required to presume the voters who enacted Prop. 57 read the actual text of the proposed law that was printed 82 pages deeper into the pamphlet from the ballot materials already discussed, *ante*.[4]  (See *Brosnahan v. Brown* (1982) 32 Cal.3d

_____

[4] I have my doubts as to the continuing validity of the presumption that initiative voters read the actual text of the proposed laws.  In a report prepared by the Initiative and Referendum Task Force of the National Conference of State Legislatures (NCSL), the authors conclude, "The ballot title and summary are arguably the most important part of an initiative in terms of voter education. *Many voters never read more than the title and summary of the text of initiative proposals*.  Therefore, it is of critical importance that titles and summaries be concise, accurate and impartial." (NCSL, Initiative and Referendum in the 21st Century:  Final Report and Recommendations of the NCSL I&R Task Force (July 2002) p. 24, italics added, at <http://www.ncsl.org/Portals/1/documents/ legismgt/irtaskfc/IandR_report.pdf> [as of Oct. 1, 2019].)  Academic commentators echo those findings.  "Because voters typically rely on titles, summaries, or information from people and organizations that support or oppose a proposition, it is easy to gloss over the particulars, resulting in confusion or misunderstanding." (Kashani & Stern, Making California's Initiative Process More Deliberative (2011) 47 Cal. Western L.Rev. 311, 317.)  "Even among citizens who spend an above-average amount of time deliberating initiatives, the time the voters devote to studying the measures may still not rise to the level of deliberation at the legislative level." (*Ibid*.; see *id*. at p. 322 ["[T]he level of meaningful participation in policy making by voters might not be as great as the representative democracies set up by the Framers and subsequently by the states."].)

Other commentators are more pessimistic about voter education, reporting most voters do not read the ballot pamphlets at all, let alone the text of proposed laws. (Cronin, Direct Democracy:  The Politics of Initiative, Referendum, and Recall (Harvard U. Press 1989) 82 [citing study of surveys conduct in California that reported "'most voters do not read the pamphlet or use it as a source of information for decisions on propositions.'"]; see Pak, The Counter-Majoritarian Difficulty in Focus:  Judicial Review of Initiatives (1999) 32 Colum. J.L. & Soc. Probs.  237, 254, citing Cronin, at p. 82 ["In California, most voters do not read the pamphlet purporting to explain the initiatives."].)

13

236, 252.)  Even assuming the voters read Prop. 57's uncodified statement of purpose and intent, I believe the majority places far too much weight on that statement.  "In considering the purpose of legislation, statements of the intent of the enacting body contained in a preamble, while not conclusive, are entitled to *consideration*.  [Citations.]  Although such statements in an uncodified section do not confer power, determine rights, or enlarge the scope of a measure, they properly may be utilized as an aid in construing a statute."  (*People v. Canty* (2004) 32 Cal.4th 1266, 1280, italics added; accord, *People v. Valencia* (2017) 3 Cal.5th 347, 362.)

Prop. 57's statement of purpose and intent provides:  "In enacting this act, it is the purpose and intent of the [P]eople of the State of California to:  [¶]  1. Protect and enhance public safety.  [¶] 2. Save money by reducing wasteful spending on prisons.  [¶] 3. Prevent federal courts from indiscriminately releasing prisoners.  [¶] 4. Stop the revolving door of crime by emphasizing rehabilitation, especially for juveniles.  [¶] [and] 5. Require a judge, not a prosecutor, to decide whether juveniles should be tried in adult court."  (Prop. 57, § 2.)

Even giving Prop. 57's statement of intent and purpose due "consideration" (*People v. Canty*, *supra*, 32 Cal.4th at p. 1280), it does not bear the weight placed upon it by the majority.  The majority emphasizes some of the stated goals, such as saving money and stopping the revolving prison doors for minors, but glosses over the fact that, when it comes to minors, Prop. 57 expressly stated it had the modest goal of reallocating decisionmaking authority about transfers to adult criminal court from the prosecutor to a juvenile court judge.  (Maj. opn. *ante*, at pp. 14-20.)  True enough, eliminating the ability

14

to try and convict minors in adult court would certainly advance the goals of saving the state money by reducing the state prison population.  But as explained, *ante*, the ballot pamphlet carefully explained to the voters that any savings to the state from juvenile justice reform would only be realized *if* juvenile court judges, after conducting fitness hearings, transferred less minors to adult court.  By necessary implication, the voters were told it is entirely possible that the same number of minors would be sent to adult court and *no* savings to the state would be realized.

The leading decision interpreting Prop. 57 supports my conclusion that the intent of the voters was to enact more modest juvenile justice reforms than the majority suggest they did.  In *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, the Supreme Court, applying *In re Estrada* (1965) 63 Cal.2d 740, concluded Prop. 57 applied retroactively to nonfinal cases because "[t]he *possibility* of being treated as a juvenile in juvenile court— where rehabilitation is the goal—rather than being tried and sentenced as an adult *can* result in dramatically different and more lenient treatment."  (*Lara*, at p. 303, italics added.)  As the majority correctly recognizes, Senate Bill No. 1391 "goes a step beyond [Prop. 57] and shields an *entire class* of minors from criminal court," and it "*definitely*, not just potentially, increases the number of juveniles who will remain in the juvenile justice system and receive rehabilitation-focused services as a consequence of their offenses."  (Maj. opn. *ante*, at pp. 15-16, second italics added.)  If the intent of the voters who enacted Prop. 57 was to modestly reform juvenile justice, but to leave in place the ability to transfer 14- and 15-year-old juvenile offenders to adult criminal court, I simply cannot agree with the majority that Senate Bill No. 1391 is a consistent amendment

15

because it goes much farther than the voters intended and eliminates the ability to do so.[5]

V.

Finally, it appears to me the majority's interpretation of Prop. 57, and its conclusion that Senate Bill No. 1391 is consistent with Prop. 57, raises potential separation of power problems. (Cf. *People v. Superior Court (T.D.)*, *supra*, 38 Cal.App.5th at p. 378 (dis. opn. of Poochigian, Acting P.J.) [Sen. Bill No. 1391 "effectively *prohibits* judges from determining whether certain juveniles should be transferred to criminal court."].) The courts have long held that, regardless of who may or may not request a fitness hearing under section 707, "the court, on its own motion, [may] order a hearing to determine a person's fitness." (*Green v. Municipal Court* (1976) 67 Cal.App.3d 794, 803; accord, *In re Richard C.* (1994) 24 Cal.App.4th 966, 971, fn. 8 ["the court may entertain such a petition [for a fitness hearing] on its own motion."]; *In re*

---

[5] The majority is correct that nothing in Prop. 57 was meant to *effectuate* or *increase* the number of minors transferred from juvenile court to adult criminal court. (Maj. opn. *ante*, at p. 21.) But that is beside the point. The juvenile justice reform enacted by Prop. 57 maintained much of the status quo by leaving open the possibility that 14- and 15-year-old juvenile offenders would still be found unfit for juvenile court treatment and transferred to adult court. It merely changed who gets to make the decision.

Although no Court of Appeal majority concludes as I do, I am not alone. (*People v. Superior Court (S.L.)* (Sept. 20, 2019, H046598) ___ Cal.App.5th ___ [2019 Cal.App. Lexis 904, *14-*17] (dis. opn. of Grover, J.); *People v. Superior Court (I.R.)* (2019) 38 Cal.App.5th 383, 395-398 (dis. opn. of Poochigian, Acting P.J.); *People v. Superior Court (T.D.)* (2019) 38 Cal.App.5th 360, 378-382 (dis. opn. of Poochigian, Acting P.J.).) I express no opinion on the wisdom of the policy choice to all but eliminate the ability to try 14- and 15-year-old juvenile offenders in adult criminal court. Nor do I find it necessary to determine, in this proceeding, whether the Legislature has the power to do so. Assuming it does have that power, however, I do question the wisdom to make such a change indirectly by the simple artifice of eliminating the ability of the prosecutor to request a fitness hearing.

*Rodney F.* (1988) 203 Cal.App.3d 177, 186 ["the court retains discretion in such cases."]; see *People v. Davis* (1997) 15 Cal.4th 1096, 1105 (dis. opn. of Mosk, J.) [finding of unfitness for juvenile treatment "may . . . be made by juvenile court *ex mero motu*."]; 16 Witkin, Summary of Cal. Law (11th ed. 2017) Juvenile Court Law, § 712, p. 921.)

Nothing on the face of Prop. 57 or Senate Bill No. 1391 purports to eliminate the juvenile court's existing authority to conduct a fitness hearing on its own motion and transfer 14- and 15-year-old juvenile offenders to adult criminal court in appropriate cases. In the absence of "'a clear legislative direction to the contrary'" (*People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 518), I would not casually conclude the voters and Legislature meant to do so. And, although Senate Bill No. 1391 eliminates the prosecutor's ability to *officially request* a fitness hearing for possible transfer to adult criminal court, I would conclude the prosecutor is *not* barred from informally inviting the juvenile court to exercise its discretion and conduct a fitness hearing on its own motion. (Cf. *People v. Carmony* (2004) 33 Cal.4th 367, 375-376 [defendants, who are expressly barred from moving trial court to dismiss strikes under Pen. Code, § 1385, may informally invite court to exercise its discretion].)

IV.

Because I conclude Senate Bill No. 1391 is not consistent with and does not further the intent of the voters who enacted Prop. 57, and it is ineffective, I would deny B.M.'s petition. Therefore, I must dissent.

McKINSTER
Acting P. J.

17